PAUL C. BAKER AND CONRAD WHITFIELD *v.* STATE OF MARYLAND

[No. 523, September Term, 1971.]

* * *

CHARLES WILSON *v.* STATE OF MARYLAND

[No. 540, September Term, 1971.]

*Decided March 28, 1972.*

The causes were argued before ORTH, MOYLAN and GILBERT, JJ.

*Josef E. Rosenblatt, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, V. Lanny Harchenhorn, State's Attorney for Carroll County, Milton B. Allen, State's Attorney for Baltimore City,* and *Philip E. Epstein, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

In appeal No. 540, *Sheldon P. Schuman,* with whom were *Koepenick, Patterson & Schuman,* on the brief, for appellant.

*Josef E. Rosenblatt, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Andrew L. Sonner, State's Attorney for Montgomery County,* and *Jeffrey R. Werner, Assistant State's Attorney for Montgomery County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court. MOYLAN, J., dissents and files dissenting opinion at page 102 *infra*.

These appeals are concerned with double jeopardy.

## I

Article V of the "Articles in Addition to, and in Amendment of, the Constitution of the United States of America" [1] contains a clause providing "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb." It took the Supreme Court of the United States 100 years to announce that, contrary to its view prior expressed,[2] the double jeopardy clause of the fifth amendment did, after all, directly apply to state criminal prosecutions. The fourteenth amendment was ratified in 1868 and in 1969 the Court said in *Benton v. Maryland*, 395 U. S. 784, 787: "On the merits, we hold that the Double Jeopardy Clause of the Fifth Amendment is applicable to the States through the Fourteenth Amendment * * *." [3] Under *Benton*, double jeopardy

---

1. The Constitution of the United States became effective on 4 March 1789 by virtue of its ratification by the conventions of eleven states. In a simple resolution six of the States, of which Maryland was one, accepted the Constitution as it was submitted. Other States, while ratifying it, demanded amendments and alterations intended, as Massachusetts said, "to remove the fears and quiet the apprehensions of many of the good people of this Commonwealth and more effectively guard against an undue administration of the Federal Government." The resolutions of New York and Virginia, especially, eloquently expressed the States' anxiety that individual liberties be guaranteed and that State powers be preserved. There resulted twelve "Articles in Addition to, and in Amendment of, the Constitution of the United States of America." They were proposed by Congress on 25 September 1789 when they passed the Senate, having been approved by the House on the preceding day, both without record votes. Ten of the proposed Amendments were authenticated as ratified by three-fourths of the States in a circular letter dated 1 March 1792 from Secretary of State Thomas Jefferson to the Governors of the States, and as the first ten amendments to the Constitution are known as the Bill of Rights. The two amendments proposed but not ratified concerned apportionment of representatives and compensation of members of Congress.

2. See *Palko v. Connecticut*, 302 U. S. 319 (1937).

3. *Benton* continued the trend of the Court in looking to specific guarantees of the Bill of Rights to determine the contours of the fourteenth amendment. *Washington v. Texas*, 388 U. S. 14, 18. To

can not be considered either by the watered-down standard of *Palko v. Connecticut,* 302 U. S. 319 (see note 3 herein), or by the common law standards theretofore applied in Maryland. See *Greathouse v. State,* 5 Md. App. 675. In state prosecutions as in federal prosecutions, double jeopardy must be applied in accordance with the Supreme Court's constitutional constructions and interpretations from time to time of the fifth amendment clause.[4] See *Gaskins v. State,* 10 Md. App. 666; *Boblits v. State,* 7 Md. App. 391.

"The Constitution of the United States, and the Laws made, or which shall be made, in pursuance thereof, and all Treaties made, or which shall be made, under the au-

---

reach its holding the Court had to overrule the landmark case of *Palko v. Connecticut,* 302 U. S. 319, in which it said that federal double jeopardy provisions were not applicable against the states. Only when a kind of jeopardy subjected a defendant to "a hardship so acute and shocking that our policy would not endure it" did the fourteenth amendment come into play. *Id.,* at 328. To justify departing from *Palko* the Court characterized *Palko's* rationale as a "notion that basic constitutional rights can be denied by the States as long as the totality of the circumstances does not disclose a denial of 'fundamental fairness.'" 395 U. S. at 795. It said that its recent decisions had rejected that notion, pointing to the overruling of *Betts v. Brady,* 316 U. S. 455, by *Gideon v. Wainwright,* 372 U. S. 335, and the overruling of *Twining v. New Jersey,* 211 U. S. 78 by *Malloy v. Hogan,* 378 U. S. 1. It thought that once a particular Bill of Rights guarantee is decided to be "fundamental to the American scheme of justice," *Duncan v. Louisiana,* 391 U. S. 145, 149, "the same constitutional standards apply against both the State and Federal Governments." 395 U. S. at 795. It then discussed the fundamental nature of the guarantee against double jeopardy and decided it was "clearly 'fundamental to the American Scheme of justice.'" *Id.,* at 796.

4. It may be that the Supreme Court has not made a clear and precise ruling on whether or not *Benton* is to be prospectively or retroactively applied. Nor have we. But see concurring opinion in *State v. Campbell and Reeves,* 7 Md. App. 538, 542. In *Ashe v. Swenson,* 397 U. S. 436, a plurality of three noted: "There can be no doubt of the 'retroactivity' of the Court's decision in *Benton v. Maryland.* In *North Carolina v. Pearce,* 395 U. S. 711, decided the same day as *Benton,* the Court unanimously accorded full 'retroactive' effect to the *Benton* doctrine." At 436, n. 1. However, in *Waller v. Florida,* 397 U. S. 387, 391, n. 2, the majority noted that neither *Ashe* nor *Waller* resolved the question of *Benton's* retroactivity since that argument was already requested and scheduled in another appeal. Thereafter, a unanimous Court, in *Price v. Georgia,* 398 U. S. 323, 331, n. 9, without any retroactivity discussion and citing *Waller,* noted that *"Benton* has fully retroactive application." See *Commonwealth v. Richbourg,* 442 Pa. 147, 275 A. 2d 345 (1971).

thority of the United States, are, and shall be the Supreme Law of the State; and the Judges of this State, and all the People of this State, are, and shall be bound thereby; anything in the Constitution or Law of this State to the contrary notwithstanding." Art. 2, Declaration of Rights, Constitution of Maryland. This mandate includes decisions of the Supreme Court of the United States construing the federal constitution. *Wilson v. Turpin,* 5 Gill 56; *Howell v. State,* 3 Gill 14. All that need be done, therefore, is to ascertain the views of that Court as to its construction of the federal constitution and apply them in a particular factual posture. Unfortunately, however, due to the divisiveness of the Court, what its views may be at the moment are sometimes difficult to determine. Some phases of double jeopardy fall into that category, and unhappily one of them directly concerns the issue before us—the application of the double jeopardy clause of the fifth amendment to further prosecution after a judicial declaration of a mistrial.

It is axiomatic that a person cannot be twice put in jeopardy for an offense until he has been once put in jeopardy for that offense. Necessary to any consideration of the constitutional clause, therefore, is a determination when jeopardy attaches. We are satisfied that it is clearly established that the fifth amendment's double jeopardy clause attaches when the trial commences.[5] A defendant is placed in jeopardy in a criminal proceeding once he is put on trial before the trier of facts, whether the trier be a jury or a judge.[6] See *Green v. United States,*

---

5. Compare the common law rule as stated in *Hoffman v. State,* 20 Md. 425, 434 and applied in *Greathouse v. State, supra,* 688-690, *cert. den.,* 253 Md. 734, decided prior to *Benton v. Maryland, supra.*

6. This conclusion may be reasoned to flow from considering the fifth amendment's prohibition as representing a constitutional policy of finality for the defendant's benefit in criminal proceedings. The Court noted in *Green,* at 187-188 that the policy underlying the fifth amendment's provision "is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity,

355 U. S. 184, 188; *Wade v. Hunter,* 336 U. S. 684, 688. Thus the constitutional policies underpinning the fifth amendment's guarantee are implicated at that point in the proceedings.

It is firmly established in Maryland that the determination whether or not to grant a mistrial is within the sound discretion of the trial court. *Gerstein v. State,* 10 Md. App. 322, 329, *cert. den.,* 260 Md. 720. The question is when does the declaration of a mistrial raise the double jeopardy barrier against a second prosecution. We turn to the opinions of the Supreme Court to seek an answer.

### The Perez Opinion

In the leading case of *United States v. Perez,* 22 U. S. (9 Wheat.) 579 (1824) Mr. Justice Story for an unanimous Court said with reference to a reprosecution after a mistrial had been declared without the consent of the defendant:[7]

> "We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the cir-

as well as enhancing the possibility that even though innocent he may be found guilty."

The opinion delivering the judgment of the Court in *United States v. Jorn,* 91 S. Ct. 547, thought that this expresses two considerations: (1) "a power in government to subject the individual to repeated prosecutions for the same offense would cut deeply into the frame work of procedural protections which the Constitution establishes for the conduct of the criminal trial"; and (2) "society's awareness of the heavy personal strain which a criminal trial represents for the individual defendant is manifested in the willingness to limit the Government to a single criminal proceeding to vindicate its very vital interest in enforcement of criminal laws." At 554.

7. The holding was that a defendant in a capital case might be retried after the trial judge had, without the defendant's consent, discharged a jury that reported itself unable to agree.

cumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office."

## The Gori Opinion

In *Gori v. United States,* 367 U. S. 364 (1961), the Circuit Court of Appeals for the Second Circuit *in banc* affirmed the petitioner's conviction at his second trial after his first trial had been terminated by the trial judge's declaration of a mistrial *sua sponte* and without petitioner's active and express consent. The Supreme Court by a majority of five to four affirmed, agreeing that the fifth amendment's prohibition of double jeopardy did not require a contrary result. Observing that "This Court has long favored the rule of discretion in the trial judge to declare a mistrial and to require another panel to try the defendant if the ends of justice will be best served * * *, *Brock v. State of North Carolina,* 344 U. S. 424, 427," the Court said it had "consistently declined to scrutinize with sharp surveillance the exercise of that discretion." At 368. It designated the *Perez* case as "the authoritative starting point of our law in this field." Ibid. It characterized the statements of Mr. Justice Story, quoted *supra,* as "the principles which have since guided the federal courts in their application of the concept of double jeopardy to situations giving rise to mistrials." Ibid. The *Gori* opinion found that the case before it fell within those broad considerations. The Court said that although "judicial wisdom counsels against anticipating

hypothetical situations in which the discretion of the trial judge may be abused and so call for the safeguard of the Fifth Amendment," they were unwilling "where it clearly appears that a mistrial has been granted in the sole interest of the defendant, to hold that its necessary consequence is to bar all retrial." At 369. The Court explained why, 369-370:

> "It would hark back to the formalistic artificialities of seventeenth century criminal procedure so to confine our federal trial courts by compelling them to navigate a narrow compass between Scylla and Charybdis. We would not thus make them unduly hesitant conscientiously to exercise their most sensitive judgment—according to their own lights in the immediate exigencies of trial—for the more effective protection of the criminal accused."

In reaching the decision the Court said, at 367-368, that it had been settled law in the Supreme Court since 1824 that "The double-jeopardy provision of the Fifth Amendment * * * does not mean that every time a defendant is put on trial before a competent tribunal he is entitled to go free if the trial fails to end in a final judgment," quoting *Wade v. Hunter, supra,* 688, and giving numerous citations. It continued, at 368:

> "Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment." [8]

---

8. In *Gori* it was unclear what reasons caused the trial judge to declare the mistrial. The Court of Appeals characterized the action as "overassiduous" and criticized it as "premature." But it concluded nevertheless that the trial judge "was acting according to his convictions in protecting the rights of the accused", and did

### The Jorn Opinion

We have centered to this point on the *Perez* and *Gori* cases because of their treatment in *United States v. Jorn,* 91 S. Ct. 547 (1971). *Jorn* would have answered material questions related to double jeopardy had there been an opinion rendered which represented a majority of the Court. But there was no opinion of the Court; there was a plurality opinion and a dissenting opinion. Mr. Justice Harlan delivered the judgment of the Court in an opinion joined by the Chief Justice,[9] Mr. Justice Douglas and Mr. Justice Marshall. Mr. Justice Black and Mr. Justice Brennan joined the judgment of the Court but not the opinion delivering the judgment. They thought the Court lacked jurisdiction over the appeal under a federal statute. 91 S. Ct. at 558. Mr. Justice Stewart, with whom Mr. Justice White and Mr. Justice Blackmun joined, dissented. Thus there was a majority of six joining in the judgment but only a plurality of four joining in the opinion delivering the judgment. That opinion is therefore not that of the Court and because it is not the opinion of the Court none of its findings, conclusions and views are constitutionally the "Supreme Law" of Maryland nor are the "Judges of this State, and all the People of this State * * * bound thereby." In other words, the opinion of the plurality of four Justices is no more controlling in this State than is the dissenting opinion of the three Justices. Therefore, we may look at the Harlan opinion and the Stewart opinion only in the frame of reference of their persuasiveness. We shall so consider them in the light of prior

---

not hold the mistrial ruling erroneous or an abuse of discretion. The opinion of the Supreme Court found unquestionable that "the order was the product of the trial judge's extreme solicitude—an overeager solicitude, it may be—in favor of the accused." 367 U. S. at 367.

9. The Chief Justice joined in the opinion and judgment but "not without some reluctance, however, since the case represents a plain frustration of the right to have this case tried, attributable solely to the conduct of the trial judge. If the accused had brought about the erroneous mistrial ruling we would have a different case, but this record shows nothing to take petitioner's claims outside the classic mold of being twice placed in jeopardy for the same offense." 91 S. Ct. at 558.

opinions of the Supreme Court which are binding on us. The cases before us will be so decided.

## Jorn's Harlan Opinion

We said *supra* that the grant *vel non* of a mistrial is within the sound discretion of the trial court. The Harlan opinion in *United States v. Jorn, supra,* presents a caveat in the exercise of this discretion within the frame of reference of the constitutional guarantee against double jeopardy. Of course, retrial is not precluded in every case where the trial is aborted after it commences. To understand when retrial is precluded and when it is not precluded under the Harlan opinion's rationale, we start with the proposition: "Certainly it is clear beyond question that the Double Jeopardy Clause does not guarantee a defendant that the Government will be prepared, in all circumstances, to vindicate the social interest in law enforcement through the vehicle of a single proceeding for a given offense." 91 S. Ct. at 556. Thus reprosecution for the same offense is permitted where the defendant wins a reversal on appeal of a conviction. *United States v. Ball,* 163 U. S. 662.[10] This is so because "the defendant's double jeopardy interests, however defined, do not go so far as to compel society to so mobilize its decision-making resources that it will be prepared to assure the defendant a single proceeding free from harmful governmental or judicial error." 91 S. Ct. at 556. In other words, as we have frequently pointed out, an accused is entitled to a fair trial, not a perfect trial. *Boblits v. State, supra,* at 400. However, what is significant in permitting a retrial upon reversal of a conviction on appeal is that the defendant has not been deprived of his option to go to the first trier of fact, be it court or jury, and, perhaps, end the dispute then and there with an acquittal. The defendant has a "valued right to have his trial com-

---

**10.** In this jurisdiction retrial on remand from the reversal of a judgment is permitted even when the reversal comes about because the evidence adduced was not legally sufficient to sustain the conviction. *Gray v. State,* 254 Md. 385, cert. den., 90 S. Ct. 961.

pleted by a particular tribunal." See *Wade v. Hunter, supra,* 689. This right is a valued one because the defendant has a significant interest in the decision whether or not to take the case from the trier of fact when circumstances occur which might be thought to warrant a declaration of mistrial, independent of the bad faith conduct by judge or prosecutor. "Thus where circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error." [11] 91 S. Ct. at 557. However, the proposition that reprosecution for the same offense is not constitutionally precluded after reversal on appeal or after declaration of a mistrial on motion by the defendant though the reversal or mistrial were occasioned by prosecutorial or judicial error, does not compel the conclusion that double jeopardy policies are confined to prevention of prosecutorial or judicial overreaching. The opinion holds they are not when the mistrial is by a *sua sponte* judicial declaration, because when the judge, acting without the defendant's consent, aborts the proceeding, the defendant has been deprived of his right to have his fate determined by the same trier of fact before whom his trial commenced. But the deprival of the right does not automatically raise the double jeopardy barrier against a second prosecution. This is so because "a de-

---

11. But the opinion cautions, n. 12 at 557: "Conversely, where a defendant's mistrial motion is necessitated by judicial or prosecutorial impropriety designed to avoid an acquittal, reprosecution might well be barred."

It would seem that when the defendant seeks an appeal or moves for a mistrial he is in effect waiving his right not to be put twice in jeopardy for the same offense. As this is a constitutional right the effectiveness of the waiver would ordinarily have to be tested by constitutional standards. *Johnson v. Zerbst,* 304 U. S. 458; *Moore v. State,* 7 Md. App. 330, *cert. den.,* 256 Md. 746. But the opinion seems to say that this is not necessarily so. It states at n. 11 at 557, discussing *United States v. Tateo,* 377 U. S. 463, that "the question of 'voluntariness' for purposes of assessing the validity of a plea of guilty—whether offered before or at trial—must be distinguished from the question of 'voluntariness' for purposes of assessing reprosecutability under the Double Jeopardy Clause."

fendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." [12] *Wade v. Hunter, supra,* at 689. The resolution of when the double jeopardy barrier is raised and when it is not in such circumstance is the heart of the Harlan opinion.

The standard on which the opinion relies to determine the constitutionality of retrial vis-a-vis mistrial is that set out in *United States v. Perez, supra.* The opinion said that the *Perez* case had since been applied by the Supreme Court as a standard of appellate review for testing the trial judge's exercise of his discretion in declaring a mistrial without the defendant's consent.[13] But the Court has persisted in a conscious refusal "to channel the exercise of that discretion according to rules based on categories of circumstances", though at the same time being well aware of "the elusive nature of the problem

---

12. The opinion pointed out that it was readily apparent that a mechanical rule prohibiting retrial would be too high a price to pay for the added assurance of personal security and freedom from governmental harassment such a rule would provide. It noted that a criminal trial, even in the best of circumstances, was a complicated affair to manage. "The proceedings are dependent in the first instance on the most elementary sort of considerations, e.g., the health of the various witnesses, parties, attorneys, jurors, etc., all of whom must be prepared to arrive at the courthouse at set times." 91 S. Ct. at 554. And added thereto are "scheduling problems arising from case overloads, and the Sixth Amendment's requirement that the single trial to which the double jeopardy provision restricts the Government be conducted speedily." Ibid. The recognition, even by a plurality of the Court, of such practical and very real problems and the consideration of them is refreshing.

13. The opinion gave examples, at 555:
"*Simmons v. United States,* 142 U. S. 148, 12 S. Ct. 171, 35 L. Ed. 968 (1891) (reprosecution not barred where mistrial declared because letter published in newspaper renders juror's impartiality doubtful); *Logan v. United States,* 144 U. S. 263, 12 S. Ct. 617, 36 L. Ed. 429 (1892) (reprosecution not barred where jury discharged after 40 hours of deliberation for inability to reach a verdict); *Thompson v. United States,* 155 U. S. 271, 15 S. Ct. 73, 39 L. Ed. 146 (1894) (reprosecution not barred where jury discharged because one juror had served on grand jury indicting defendant); *Wade v. Hunter,* 336 U. S. 684, 69 S. Ct. 834, 93 L. Ed. 974 (1949) (retrial not barred where military court martial discharged due to tactical necessity in the field)."

presented by judicial action foreclosing the defendant from going to his jury." 91 S. Ct. at 557. Vital competing interests of the State and the defendant are involved and "bright-line rules based on either the source of the problem or the intended beneficiary of the ruling would only disserve [those interests]." Ibid. But the discretion of the trial court must still be exercised. So even though rules could not be evolved,[14] some general guidelines appear:

> "The trial judge must recognize that lack of preparedness by the Government to continue the trial directly implicates policies underpinning both the double jeopardy provision and the speedy trial guarantee. Cf. *Downum v. United States,* 372 U. S. 734, 83 S. Ct. 1033, 10 L.Ed.2d 100 (1963). Alternatively, the judge must bear in mind the potential risks of abuse by the defendant or society's unwillingness to unnecessarily subject him to repeated prosecutions. Yet, in the final analysis, the judge must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *Id.,* 557-558.

The opinion repudiated a suggestion that *Gori v. United States, supra,* required a deviation from the Perez standard.[15] Observing that *Gori* adhered in the main to

---

14. It was felt that rules could not be evolved "based on the source of the particular problem giving rise to a question whether a mistrial should or should not be declared, because, even in circumstances where the problem reflects error on the part of one counsel or the other, the trial judge must still take care to assure himself that the situation warrants action on his part foreclosing the defendant from a potentially favorable judgment by the tribunal. In sum, counsel for both sides perform in an imperfect world * * *." At 557.

15. It was unable to conclude in any event on the record before it that *Jorn* was a case of a mistrial made "in the sole interest of the defendant."

the *Perez* theme of a "manifest necessity" standard of appellate review but could be construed to suggest "the possibility of a variation on that theme according to a determination by the appellate court as to which party to the case was beneficiary to the mistrial ruling", the opinion appeared to tie the judgment that in the circumstances there existent there was no abuse of discretion to the fact that "the judge was acting 'in the sole interest of the defendant.' 367 U. S. 369 * * *." At 555-556. The Court thought that "a limitation on the abuse of discretion principle based on an appellate court's assessment of which side benefited from the mistrial ruling does not adequately satisfy the policies underpinning the double jeopardy provision." At 556.

## Jorn's Stewart Opinion

The Stewart opinion construed the Harlan opinion as saying that "whenever a trial judge in a criminal case has 'abused his discretion' in declaring a mistrial on his own motion, the constitutional guaranty against double jeopardy categorically operates to forestall a trial of the case on its merits," 91 S. Ct. at 558-559, and expressed disagreement with such a rule.[16] It observed: "It is, of course, common ground that there are many circumstances under which a trial judge may discharge a jury and order a new trial, without encountering any double jeopardy problems", at 559, giving as examples, where the judge acts at the instance of the defendant himself, referring to *United States v. Tateo*, 377 U. S. 463, 467, and where the jury cannot reach a verdict,[17] citing *Perez*. And it pointed out, at 559, there were also situations where the circumstances under which the mistrial was declared may be such as to bar a future prosecution, giv-

---

16. The Stewart opinion appears to follow in significant part the dissenting opinion of Mr. Justice Douglas, joined by Chief Justice Warren, Mr. Justice Black and Mr. Justice Brennan, in *Gori v. United States*, 367 U. S. at 370-373.

17. The opinion made clear that "there the trial judge may proceed on his own initiative, even over the active objection of the defendant." 91 S. Ct. at 559.

ing as one example where a "judge exercises his authority to help the prosecution, at a trial in which its case is going badly, by affording it another, more favorable opportunity to convict the accused," [18] quoting *Gori*, 367 U. S. at 369. It noted that on its facts *Jorn* did not fall neatly into any of these conventional categories.

The basic disagreement of the Stewart opinion with the Harlan opinion was that although the Harlan opinion adopted an abuse of discretion rule to be tested by the *Perez* standard, it misconstrued the *Perez* standard. It appeared to construe it "to mean that an appellate court, in determining the application of the double jeopardy guaranty, must measure the trial judge's action in declaring the mistrial against a standard of good trial practice. If the trial judge has conspicuously failed to meet such a standard, then, regardless of the nature and consequences of the error, the Constitution bars another trial." 91 S. Ct. at 560. The Stewart opinion viewed this both "overbroad and flatly inconsistent" with the Court's decision in *Gori*. It thought that what *Gori* established, and correctly, was that the simple phrase "abuse of discretion" was not enough in itself to resolve double jeopardy questions in cases of reprosecution after declaration of a mistrial. The meat of the opinion is thus expressed, at 560-561:

> "Whether or not there has been an 'abuse of discretion' sufficient to bar retrial cannot be determined without reference to the purpose and effect of the mistrial ruling. The real question is whether there has been an 'abuse' of the trial process resulting in prejudice to the accused, by way of harassment or the like, such as to outweigh society's interest in the punishment of crime. It is in this context, rather than simply

---

18. The opinion "supposed" in such a case "that whether misconduct of this kind occurs at the instance of the prosecutor or on the trial judge's sole initiative, there is no question but that the guaranty against double jeopardy would make another trial impermissible."

in terms of good trial practice, that the trial judge's 'abuse of discretion' must be assessed in deciding the question of double jeopardy." [19]

## II

We are convinced, and so find, that the rule representing the opinion of a majority of the Supreme Court is that the question whether retrial following a *sua sponte* judicially declared mistrial without the defendant's consent is prohibited by the double jeopardy clause of the fifth amendment is to be resolved by a determination whether the mistrial declaration was an abuse of judicial discretion. We are satisfied that "abuse of judicial discretion" is to be assessed by the manifest necessity standard of *Perez* as explicated by *Gori*. We are persuaded that the proper interpretation of *Gori* is that of the Stewart opinion in *Jorn*. Therefore, we shall determine whether reprosecution in the cases now before us would violate the fifth amendment guarantee against double jeopardy by reference to the purpose and effect of the mistrial ruling concerned and by considering abuse of the trial court's discretion in declaring the mistrial in the context of whether there was an abuse of the trial process resulting in prejudice to the accused, by way of harassment or the like, such as to outweigh society's interest in the punishment of crime. Cf. *United States v. Walden*, 448 F. 2d 925 (4th Cir. 1971) ; *United States ex rel Somerville v. Illinois*, 447 F. 2d 733 (7th Cir. 1971) ;

---

19. The Stewart opinion noted, at 561, n. 3:
*Downum v. United States*, 372 U. S. 734, 83 S. Ct. 1033, 10 L.Ed.2d 100, is not to the contrary. As the plurality opinion today points out, that case recognized that 'lack of preparedness by the Government to continue the trial directly implicates policies underpinning both the double jeopardy provision and the speedy trial guarantee', *supra*, at 557-558. Failure of the prosecution to go forward with its case in an expeditious and orderly manner is quite different from even a serious error in trial procedure by the presiding judge."
The note pointed out as well settled that when a jury verdict is reversed on appeal because of an error by the trial judge, a new trial is permitted, citing *Forman v. United States*, 361 U. S. 416 and *Bryan v. United States*, 338 U. S. 552. And see *supra*.

*United States v. LeMay,* 330 F. Supp. 628 (Montana, 1971) ; *United States v. Medina,* 323 F. Supp. 1277 (Pa. 1971) ; *United States v. Pappas,* 445 F. 2d 1194 (3rd Cir. 1971). In any event, however, within these principles, each case is to be decided on its own facts. There is no "mechanical" rule controlling; the Supreme Court has not formulated rules based on categories of circumstances which will permit or preclude retrial.

## III

*Appeal No. 523, Baker and Whitfield v. State*

PAUL C. BAKER and CONRAD WHITFIELD, presented by the Grand Jury for Baltimore City, were jointly indicted, charged under indictment 2305 with having murdered Ronald Melvin Jones on 16 April 1970, and under indictment 6348 with having unlawfully conspired from 2 April 1970 to 16 April 1970 to murder Jones. Upon suggestion of removal the Criminal Court of Baltimore ordered the indictments transferred for trial to the Circuit Court for Carroll County. Maryland Rule 738; *Stevenson v. State,* 9 Md. App. 152. Docketed as No. 3210 Criminal, the trial of Baker and Whitfield, jointly tried but separately represented, commenced before a jury in the Circuit Court for Carroll County on 21 June 1971. The transcript of the proceedings in the record before us begins the next day after the close of the evidence offered by the State. It shows that at that point in the proceedings, at 11:46 a.m., the jury was recessed for lunch with direction to return at 1:00 p.m. When the jury had departed, counsel for Whitfield moved for a judgment of acquittal as to each indictment and began to argue his motions. What occurred during the course of his argument is shown by the transcript:

> "(Thereupon Juror entered Court Room)
> COURT: Is there going to be any question raised, might as well raise it now. Now, just a minute, let it be, the record show that one of the jurors was in the jury room and could have

heard so much of the motion and the Court's remarks. If there's anybody that feels prejudiced at this time please say so. I don't want to go further with the trial if you feel so. If you feel any way, one way or the other, I want to know now and not have it raised later on.

MR. GUTH (Counsel for Whitfield): For the record I will say on behalf of the defendant, Whitfield, that I don't, that it is my firm belief that the witness heard absolutely nothing that was stated, the juror rather.

COURT: Well let's go on the assumption that he did because he might have. I want to know whether or not anybody wants to raise that question at this time.

MR. GUTH: I want to—my observation from this vantage point I think the door was shut and I think it only was opened at the time as he entered and at that time there was no testimony. There was no argument or conversation in his presence.

MRS. MITCHELL (Counsel for Baker): May it please the Court I feel duty bound for my client, on behalf of my client, Paul Baker, to raise the question as to whether the juror did hear anything. The door was open and arguments had begun on the motion and for the protection of my client's rights in this case.

COURT: I don't blame you. Now I want to ask you this. Would it be sufficient to ask the juror, after lunch, whether he heard anything or do you want to rest the matter on the assumption that he did. That's entirely up to you.

MR. GUTH: I think that would be a very satisfactory method of resolving it as far as—

COURT: You're not complaining.

MR. GUTH: I'm not complaining.

COURT: Mrs. Mitchell, and she has the right to. I want her to be satisfied.

MRS. MITCHELL: I do complain on behalf of my client.

COURT: All right. We'll call it a mistrial. When the jury comes back, withdraw a juror, and dismiss the case. Set another time which will not be until August at least because I'm going away in July. Can't get it in before then. All right.

MR. GUTH: Your Honor, would your Honor possibly reconsider if this juror would return —.

COURT: I can't do it in light of Mrs. Mitchell's objection, so sir. Couldn't possibly do it."

When the jury returned at 1:00 o'clock the judge told them that he had "granted a motion for a mistrial so we'll have to withdraw a juror and call it a day. * * * We had an error in procedure. That's what it means." The jury was discharged. The docket entries read, "Upon defendants' Motion, Court declared a mistrial."

Retrial was set for 21 September 1971 and the interested parties were so informed by letter from the Clerk of the Court on 12 July. On 7 September 1971 each of Whitfield and Baker moved to dismiss the indictments, claiming further prosecution would put him twice in jeopardy, and each requested a hearing.[20]

The motions to dismiss came on for hearing on 27 September 1971.[21] Counsel presented argument. The court held its decision *sub curia*. The next day it filed an opinion and order denying the motions to dismiss.[22] The

---

20. On 30 August 1971 Baker's attorney, upon his motion, was granted leave to strike her appearance. Thereafter in the proceedings Baker was represented by Morris Lee Kaplan, Esq.

21. The motions had come on for hearing on 7 September but no writ had been issued for the defendants. They were not present and no hearing was had. Whitfield, for reason not apparent, filed another motion to dismiss the indictments on 27 September. On the same day he and Baker jointly filed a memorandum in support of the motions to dismiss.

22. In the opinion the facts surrounding the mistrial were set out "according to the court's best recollection." Some facts so set out were characterized in terms "as it recalls" and "according to our recollection." We consider the facts and circumstances to be only as they are shown by the transcript of the proceedings above produced.

court made clear in its opinion that it granted the mistrial "fearing that the juror may have heard statements that would be prejudicial to the defendants." It said, "We have no way of knowing whether any prejudicial statements were heard by the juror but felt that, in light of the objection voiced by [Baker's] defense attorney, it could not be corrected by questioning the juror." [23] The court asserted flatly: "In any event, the sole intent of the court was to protect the interest of the defendants." It added: "If the court erred in its judgment, it was occasioned only by its desire to see that the defendants got as fair a trial as possible. Certainly we had no interest in presiding over or requiring the State to present another case except as it might protect the rights of the defendants." [24] Baker and Whitfield appealed. See *Raimondi v. State*, 8 Md. App. 468, 473.

As to Baker the appeal could be disposed of on the basis that the judge acted at Baker's instance. While Baker may not have expressly moved for the mistrial, it was evident that what he desired was a mistrial. He first raised a question as to whether the juror heard anything, and then specifically objected to the court ascer-

---

23. The court also said it had "further considered the possibility of seating the alternate juror but, here again, we considered the possibility of prejudice toward the defendants, both black, in that the juror who unfortunately wandered into the courtroom was the only black juror on the panel. There was also that practical consideration of what effect the dismissal of this juror would have on the balance of the panel."

24. It seems the court considered and rejected the possibility of declaring a mistrial as to Baker and proceeding as to Whitfield, who, it found, "did not bring the question *sur le tapis* and was willing to proceed with the case", adding parenthetically "(We do not recollect that [Whitfield] insisted on continuing with the case but merely registered his acquiescence.)" The court said in the opinion that "it considered the difficulties involved in explaining to the jury the reason for carrying on with just one defendant without provoking some question in [the jury's] minds as to the presumed innocence of the defendant. Some practical difficulties would also be experienced. The case had been presented as a case against both defendants which might have mitigated against defendant Whitfield tried alone. * * * It would seem that [Whitfield] would suffer more were he required to put on his defense and then be granted a new trial on the basis that the court erred in not granting the mistrial as suggested by his codefendant."

taining from the juror what had been heard, if any-
thing. In the frame of reference of his complaints, the
court had no reasonable alternative than to declare a
mistrial. Thus no double jeopardy problems would be
encountered in a retrial of Baker. See *United States v.
Tateo, supra,* 467.

There is no real necessity, however, in distinguishing
between Baker and Whitfield in resolving their appeals.
Applying the considerations discussed in III *supra,* it is
clear that a trial of each on the merits would not violate
the constitutional guarantee. But for the inconvenience
of delay always caused by a mistrial, there is no indica-
tion that the ruling could have injured either of them.
In fact the defense had the advantage of being given a
complete preview of the State's case. There is no show-
ing of an intent on the part of the prosecution or the
judge to harass the appellants or to enhance the chances
of conviction in a second trial. There was no prosecutorial
or judicial overreaching. On the contrary, no action of
the prosecution played any part whatsoever in the dec-
laration of the mistrial and the judge affirmatively stated
without equivocation that his intent was only to protect
the interests of appellants. It may be that the trial could
have been saved if on a careful questioning of the juror
the judge was fairly convinced that the juror had heard
nothing that tended to prejudice the appellants, and per-
haps it would have been advisable for the judge to have
made inquiry of the juror personally and permitted ap-
pellants to question him before taking action as to a mis-
trial. But even assuming that the lower court's action
was plainly improper by any standard of good trial prac-
tice (although we do not think it was in the light of the
reasons advanced), the circumstances under which the
mistrial was declared did not involve "abuse" of a kind
to invoke the fifth amendment's guarantee against double
jeopardy. Considering the purpose and effect of the mis-
trial ruling, we find no abuse of the trial process result-
ing in prejudice to appellants such as to outweigh so-
ciety's interest in the punishment of crime. We hold that

the declaration of a mistrial was not such an abuse of the exercise of the trial judge's discretion as to prohibit constitutionally the further prosecution of appellants. The order of 28 September 1971 denying the motion of each of Baker and Whitfield to dismiss the indictments against him is affirmed. We have reached this decision as a matter of constitutional fact through an examination of the entire record. *Ashe v. Swenson*, 397 U. S. 436, 443.

IV

*Appeal No. 540, Wilson v. State*

On 22 March 1971, CHARLES WILSON was charged by indictments 12033 and 12034 upon presentment by the Grand Jury for Montgomery County with two offenses of storehouse breaking as therein set out. The indictments being consolidated upon the State's unopposed motion, came on for trial in the Circuit Court for Montgomery County before a jury on 22 June 1971 on pleas of not guilty. The jury was duly empaneled and sworn. The prosecutor and defense counsel each made an opening statement to the jury. The State's first witness, Jeanette Crawford was sworn and began her testimony. Evidence was adduced tending to prove the *corpus delicti* of the breaking charged in indictment 12033. On the issue of criminal agency she said that from her apartment she saw a person at the scene "but I couldn't say who it was," but he was male and black. She went to a friend's apartment and from a window there again saw a black male. Asked if she recognized him she said, "I thought I recognized him but I didn't." Afterwards she saw someone walking fast, but could not say it was the same person. "I recognized someone, but it was the wrong person. My husband told me it wasn't him. Then I found out it wasn't him later." Asked how she knew it was not him, she replied: "I believe it wasn't him." The prosecutor asked permission to approach the bench and the jury left the courtroom. The transcript reads:

"THE COURT: Sit down, gentlemen, please. The man in the white T-shirt, please come forward. What is your name?

MR. TWYMAN: James Twyman.

THE COURT: What?

MR. TWYMAN: James Twyman.

THE COURT: Are you related to this witness in any way?

MR. TWYMAN: No.

THE COURT: Now, I saw you move from one seat to another one, which is why I hit the pencil [during opening statement by the State the transcript shows the judge "tapped his pencil on the bench"] because you were talking to the lady who is now testifying while the State's Attorney was making his opening statement. What did you say to her?

MR. TWYMAN: I didn't say anything. The lady just asked what time it was.

THE COURT: I guess we are going to have to have the courtroom monitored. Why did you move your seat?

MR. TWYMAN: I just wanted to set on the end.

THE COURT: You are lying. You are lying. I am going to refer your matter to the State's Attorney's office for investigation of whether you were tampering with this witness.

MR. TWYMAN: I didn't say anything to her.

THE COURT: And I will refer this matter to the police officers as well.

MR. WERNER [Assistant State's Attorney]: Would it be proper to inquire of the witness, while she is still under oath, ·what was said to her out of the presence of the jury as an unrelated matter. Whatever she says at this juncture

is now going to determine how I am going to proceed."

The prosecutor told the court he had asked to approach the bench to claim surprise. "After she was interviewed this is not what was in the police report and what the policeman told me she was going to testify to." The transcript reflects an inquiry by the court:

"THE WITNESS: I told the boy to ask him to move over there and I asked him what time it was. That was the reason I was speaking to him and he was speaking to me.
THE COURT: Is he any relation to you?
THE WITNESS: He is no relation to me, but he does have a son by my daughter. I was getting ready to speak to him about my grandson.
THE COURT: When all this happened the State's Attorney was talking to the jury about some matter and I saw you shake your head and mumble something and I saw him move over to speak to you and you say you were asking him to move over so you could ask him what time it was when there was a clock on the wall?
THE WITNESS: Yes, that is what I asked him. I was not paying too much attention. When you hit your pencil on your desk, I was getting ready to talk to him about my grandson."

After extended discussion the court ordered that Jeanette Crawford and another witness, Susie Maith, could remain together but sequestered from the other witnesses. He directed them to be escorted to the State's Attorney's office. The court took a recess. After the recess the transcript discloses the following transpired:

"THE COURT: * * * First, I want to make a finding. Based on the proffer disclosed to the Court at the bench conference before the lengthy recess by the State of what the witness on the

stand had previously said to the police officers, she knew about these facts; that the State's claim of surprise with respect to this witness is well taken and the events related by the State's Attorney to the Court, which I think ought to be put on the record at this time, are confirmatory, to say the least, that the State's claim of surprise is well taken. I think you ought to relate on the record, Mr. State, briefly, precisely what you disclosed to defense counsel and to the Court in chambers.

MR. WERNER: May it please the Court, out of the presence of the jury I would like to relate for the record that during the recess Detective Michaleski and myself spoke to the witness, Jeanette Crawford, and she stated that on her way to the courthouse today the person known as Twyman * * * the man in the white T-shirt, approached her and asked her what it would take for her to forget who the person was she saw on the evening in question, that being January 2 through January 3.

She stated she was fearful of him and of the defendant. She replied, '$100.00.' He left her presence for a few moments, returned and gave her a $100.00 bill. She produced that $100.00 bill.

I add, she stated she was not telling the truth. * * * When she was on the stand, but when she spoke to the officer and he took the report I related to the Court at the bench she was telling the truth."

Defense counsel objected to the State's action in talking to the witness. The court said that if Wilson thought he was prejudiced thereby the court would grant a mistrial. Wilson personally affirmatively declined the offer of a mistrial. The court said:

"Very well, then, under the circumstances I

fail to see how there can be any claim of prejudice by reason of the State in these highly extraordinary circumstances when it knew it was in the possession of a statement that was in direct conflict with what the witness was already saying and violated any proper procedure in talking to the witness.

I would say, on the contrary that this was so. If you feel this witness is under any restraint by reason of that in any way. This is something which you can explore in voir diring the witness. This is one of the reasons I am affording this unique step, but not unprecedented step."

Defense counsel examined Jeanette Crawford on the voir dire. She said she told the State's Attorney why she had changed her testimony. She was asked why she had done so and started to reply. The judge intervened, pointing out that she was without assistance of an attorney and he was "thinking about the situation of her incriminating herself." The court said:

"Well, this whole situation has, I think, become highly irregular at this point and I think that notwithstanding that the defendant has said he does not wish to seek a mistrial that this may be one of those highly unusual cases where it would be in the best interests of all concerned, including the defendant and perhaps by way of protection of his constitutional rights, if the Court did declare a mistrial.

I think it is in his best interests that we do so
* * *."

It concluded:

"So I think, and I am saying sua sponte that I feel I must, in order to protect the defendant, now grant a mistrial so that he will not be forced in the presence of this jury, which has

already heard this witness give some testimony exculpatory to him, have that jury undergo the spectacle of seeing this witness recant by reason of the State's interrogation and then, in an effort to impeach that testimony, cross-examine her with a view towards what we know will be a disclosure that may tend to implicate, if not the defendant, his alibi witness, and no defendant should have to be compelled to travel that obstacle course, even if the end result might be the truth. Of course, that is what we are seeking here.

I think that this most unfortunate turn of events compels this. It seems to me, as we observe what we are now doing that no matter what step we take we find ourselves in a position where an injustice may result as to the State as well as to the defendant.

I think that while the defendant has chosen to not seek a mistrial, whatever his reasons may be, that sometimes the Court must intervene. It seems to me that we are in the throes of a dilemma at this moment. If I allow Mr. Shuman, by compelled testimony from this witness, to ascertain what transpired she will be incriminating herself. That, I think, is something which ought to be handled in some other way.

On the other hand, this defendant would, if what we are told by the State is about to happen were to take place, the defendant would be deprived of effective cross-examination. It might even rise, as I say, to a constitutional level, in terms of confrontation, and he would be forced to cross-examine his client and his alibi witness into more trouble. I think that should be separated."

The court declared a mistrial *sua sponte* and the jury was withdrawn.

On 16 September 1971 Wilson filed a motion to dismiss the indictments on the ground that further prosecution was barred by the guarantee against double jeopardy. The motion was heard on 15 October before another judge and denied on 21 October. Wilson appealed. See *Raimondi v. State, supra,* 473.

The four questions presented on appeal may all be answered within the context of whether further prosecution of Wilson under the indictments which were the subject of the original trial is prohibited under the doctrine of double jeopardy. We answer that question by applying the principles adopted in Part II hereof.

It is clear, of course, that Wilson was put in jeopardy at the original trial; the fifth amendment's guarantee was implicated when trial commenced. But, assessing the discretion exercised by the lower court in declaring the mistrial under the manifest necessity standard we see no abuse. On our independent constitutional appraisal of the entire record we find as a constitutional fact that the primary and immediate purpose of the mistrial ruling was to preserve the rights of Wilson as contemplated by the trial judge and that the effect of the mistrial ruling was precisely that. We see no prejudice to Wilson by way of harassment or the like, such as to outweigh society's interest in the punishment of crime. There was patently no judicial overreaching to harass Wilson. Nor do we think there was any prosecutorial overreaching. We see nothing improper in the prosecutor talking to the witness called by the State in the most unusual if not unique circumstances here existent, particularly when full disclosure of what took place between the prosecutor and the witness was immediately made to the court and the defense. We note that the State played no part in the basic cause of the mistrial, that is the tampering with the witness for the benefit of the accused. We feel that Wilson's right to have his trial completed by the jury first sworn to try him was constitutionally subordinated here to the public's interest in fair trials designed to end in just judgments. We hold the

lower court did not err in denying the motion to dismiss the indictments.

> *Appeal No. 523—No. 3210 Criminal in the Circuit Court for Carroll County:*
>> *As to each appellant, order of 28 September 1971 denying motion to dismiss indictments affirmed; case remanded for further proceedings; appellants to pay costs.*
>
> *Appeal No. 540 — Criminal Nos. 12033 and 12034 in the Circuit Court for Montgomery County:*
>> *Order of 21 October 1971 denying motion to dismiss indictments affirmed; case remanded for further proceedings.*[25]

*Moylan, J., dissenting:*

Respectfully, I dissent from the opinion of the Court. I further dissent from the judgment of the Court as to case number 523 as it affects the appellant Whitfield. I concur in the judgment of the Court in case number 523 as it affects the appellant Baker and in the judgment of the Court in case number 540.

I have no quarrel with the perceptive tracing in the majority opinion of the historic development of our present constitutional law on the question of double jeopardy. The basic proposition is clear that a defendant may not twice be placed in jeopardy. Since 1824, it is also clear that the prohibition is not an absolute but will

---

25. By order of 11 November 1971 of the Circuit Court for Montgomery County Wilson was authorized to prosecute his appeal as an indigent.

yield to a "manifest necessity." When a first trial ends in a mistrial, it is clear that jeopardy has once attached. Justice Story pointed out in *United States v. Perez*, 22 U. S. (9 Wheat.) 579, however, that such former jeopardy will not bar placing the defendant again in jeopardy where there was a "manifest necessity" for aborting the earlier trial.

Our constitutional law since 1824 has consisted simply of tracing the contours of Justice Story's "manifest necessity."

The ultimate issue is: By what constitutional standard do we measure whether a trial court exercised proper discretion in determining whether "manifest necessity" existed? As the majority opinion points out, the voice of the Supreme Court in this regard is not clear. The most recent expression from the Supreme Court is *United States v. Jorn*, 400 U. S. 470. There was, of course, no majority opinion. Justice Harlan wrote for four members of the Court, with two others joining simply in the judgment. I concur in and applaud the following principle of constitutional law enunciated by the majority opinion in this case, hoping that it will dutifully be remembered where we agree with plurality opinions of the Supreme Court as well as where we disagree with them:

> "Thus there was a majority of six joining in the judgment but only a plurality of four joining in the opinion delivering the judgment. That opinion is therefore not that of the Court and because it is not the opinion of the Court none of its findings, conclusions and views are constitutionally the 'Supreme Law' of Maryland nor are the 'Judges of this State, and all the People of this State * * * bound thereby.' In other words, the opinion of the plurality of four Justices is no more controlling in this State than is the dissenting opinion of the three Justices. Therefore, we may look at the Harlan opinion and the Stewart opinion only in the frame of reference of their persuasiveness."

In the absence of a clear commandment and with the option of alternative constitutional interpretations before us, we are free, in the words of Justice Holmes, to "legislate interstitially." I part from the majority in that I find the opinion of Justice Harlan more persuasive than that of Justice Stewart. I find its reasoning to be sounder; its logic to be more compelling; and its effect more directly aimed at serving the fundamental purpose of the Fifth and Fourteenth Amendments.

In judging whether there has been an adequate finding of "manifest necessity" to dislodge the protection against double jeopardy, the authoritative starting point is, of course, *Perez*. The words of Justice Story are classic:

> ". . . We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon their responsibility of the judges, under their oaths of office . . . ." 22 U. S. (9 Wheat.) at 580.

Sitting in a lower federal court in *United States v.*

*Coolidge*, (C. C. Mass.) 2 Gall 364, F. Cas. No. 14858, Justice Story further expounded that the discretion to discharge a jury before it has reached a verdict is to be exercised "only in very extraordinary and striking circumstances."

The competing interpretations of Justice Harlan and Justice Stewart of the meaning of "manifest necessity" are written essentially on a clean slate, following *Perez* and its legitimate progeny, to be sure, but not constricted by *Gori v. United States*, 367 U. S. 364. In *Jorn*, Justice Harlan viewed *Gori* as a possible "variation on . . . [the] theme" of *Perez*. It could, indeed, be viewed as an aberration on the theme of *Perez*. At the trial of *Gori* in the Eastern District of New York for receiving goods stolen in interstate commerce, the trial judge precipitously aborted the trial. The Court of Appeals for the Second Circuit characterized the action as "overassiduous" and criticized it as premature. It, nevertheless, refused to consider it as a bar to a second prosecution. The Supreme Court did not attempt to pass judgment on the propriety of the declaration of mistrial but, *inter alia*, showed great deference to the decision of the Court of Appeals. It said, at 367:

> "Certainly, on the skimpy record before us it would exceed the appropriate scope of review were we ourselves to attempt to pass an independent judgment upon the propriety of the mistrial, even should we be prone to do so—as we are not, with due regard for the guiding familiarity with district judges and with district court conditions possessed by the Courts of Appeals." [1]

1. The great deference shown by all American courts, including the Supreme Court of the United States, toward the decisions of the United States Court of Appeals for the Second Circuit, the court through the late 1950's of Learned Hand, Augustus Hand and Jerome Frank, and at that time still containing Henry Friendly and Edward Lumbard, is legendary. See Schick, *Learned Hand's Court* (1970).

Justice Frankfurter, writing for the five-man majority in *Gori,* did go on to hold, at 367:

> "In this state of the record, we are not required to pass upon the broad contentions pressed, respectively, by counsel for petitioner and for the Government. The case is one in which, viewing it most favorably to petitioner, the mistrial order upon which his claim of jeopardy is based was found neither apparently justified nor clearly erroneous by the Court of Appeals in its review of a cold record. What that court did find and what is unquestionable is that the order was the product of the trial judge's extreme solicitude—an overeager solicitude, it may be—in favor of the accused."

He summarized that holding, at 369:

> "Suffice that we are unwilling, where it clearly appears that a mistrial has been granted in the sole interest of the defendant, to hold that its necessary consequence is to bar all retrial."

The law prior to *Gori* had been clear. If a trial judge, faced with "manifest necessity," declared a mistrial, he had properly exercised his discretion; if a trial judge, absent "manifest necessity," declared a mistrial, he had abused his discretion. *Gori* would seem to say: Even if a trial judge abuses his discretion by declaring a mistrial in the absence of "manifest necessity," the defendant may not claim double jeopardy just so long as the trial judge thought he was acting for the benefit of the defendant. There was no discussion as to whether a defendant should have some election as to whether to be thus a beneficiary.

As a beacon light upon *Jorn,* however, *Gori* may well have been superseded two years later by *Downum v. United States,* 372 U. S. 734. In a narrow sense, *Downum* might be distinguished because it involved a mistrial that had been declared for the benefit of the prosecution. The

broad discussion of principle, however, resonates with pre-*Gori* language. It refers to "manifest necessity" in terms of "an imperious necessity" and in terms of "very extraordinary and striking circumstances." As an articulation of philosophical guidelines, its language is significant, at 736:

> "At times the valued right of a defendant to have his trial completed by the particular tribunal summoned to sit in judgment on him may be subordinated to the public interest—when there is an imperious necessity to do so. *Wade v. Hunter, supra* (336 U. S. 690) . . . . Harassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict are examples when jeopardy attaches. *Gori v. United States, supra* (367 U. S. 369). But those extreme cases do not mark the limits of the guarantee. The discretion to discharge the jury before it has reached a verdict is to be exercised 'only in very extraordinary and striking circumstances,' to use the words of Mr. Justice Story in *United States v. Coolidge* (C C Mass.) 2 Gall 364, F. Cas. No. 14858. For the prohibition of the Double Jeopardy Clause is 'not against being twice punished; but against being twice put in jeopardy.' *United States v. Ball,* 163 U. S. 662, 669, 41 L. Ed. 300, 302, 16 S. Ct. 1192."

To the extent that the philosophical emphasis is different, realistically the main difference between *Gori* and *Downum* is that in the two-year interim, Justice Goldberg had replaced Justice Frankfurter on the Court and the four-man minority in *Gori* had become the five-man majority in *Downum.* The rhetoric of the two cases is, in my opinion, offsetting[2] so that Justice Harlan and Jus-

---

2. For the irreconcilability of *Gori* and *Downum,* see Note, "Double Jeopardy: The Reprosecution Problem," 77 Harv. L. Rev. 1272, 1277-1281 (1964).

tice Stewart in *Jorn* were essentially writing upon a clean slate.

Justice Harlan, at the very outset of his argument, establishes the fundamental and underlying purpose intended to be served by the constitutional. protection against double jeopardy. He recites that:

> ". . . society's awareness of the heavy personal strain which a criminal trial represents for the individual defendant is manifested in the willingness to limit the Government to a single criminal proceeding to vindicate its very vital interest in enforcement of criminal laws." 400 U. S. at 479.

He reiterates the clear statement ringing down from *Ex parte Lange*, (U. S.) 18 Wall. 163, through *Green v. United States*, 355 U. S. 184, to *Benton v. Maryland*, 395 U. S. 784:

> " 'The common law not only prohibited a second punishment for the same offence, but it went further and forbid a second trial for the same offence, whether the accused had suffered punishment or not, and whether in the former trial he had been acquitted or convicted.'
>
> "The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Green, supra,* 187-188.

It is clear that the harm guaranteed against is the very act of standing trial a second time. Being placed in jeopardy, *ipso facto*, is the prejudice. The prejudice con-

sists not in being placed in *greater* jeopardy but in being placed in the same jeopardy *again*. This statement of fundamental purpose is the star on which Justice Harlan fixes his gaze without deviation. His opinion proceeds in rectilinear directness to the best effectuation of the fundamental purpose, permitting abridgement not when *arguably* necessary but only when *manifestly* necessary.

Justice Harlan forcefully argues his position, at 484-485:

> ". . . where the judge, acting without the defendant's consent, aborts the proceeding, the defendant has been deprived of his 'valued right to have his trial completed by a particular tribunal.' See *Wade v. Hunter*, 336 U. S. at 689, 98 L. Ed. at 978.
>
> "If that right to go to a particular tribunal is valued, it is because, independent of the threat of bad-faith conduct by judge or prosecutor, the defendant has a significant interest in the decision whether or not to take the case from the jury when circumstances occur which might be thought to warrant a declaration of mistrial. Thus, where circumstances develop not attributable to prosecutorial or judicial overreaching, a motion by the defendant for mistrial is ordinarily assumed to remove any barrier to reprosecution, even if the defendant's motion is necessitated by prosecutorial or judicial error. In the absence of such a motion, the Perez doctrine of manifest necessity stands as a command to trial judges not to foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings."

He summarizes, at 486:

> ". . . in the final analysis, the judge must al-

ways temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate."

Conversely, I find the opinion of Justice Stewart permits its focus to wander from the fixed star of the fundamental purpose to be served. Its reasoning is circular. It begins with lip service to the fundamental protection against prejudice, discusses the exceptions to that protection, and ends by defining "abuse" in terms of "prejudice." In the course of tracing the circle, however, "prejudice" shifts its meaning. "Prejudice," in the first instance, contemplated the very act of standing trial or being placed in jeopardy; "prejudice," in the second instance, contemplates being placed at a disadvantage or in a position of greater peril upon the retrial. Justice Stewart articulates his test, at 492:

"The real question is whether there has been an 'abuse' of the trial process resulting in prejudice to the accused, by way of harassment or the like, such as to outweigh society's interest in the punishment of crime. It is in this context, rather than simply in terms of good trial practice, that the trial judge's 'abuse of discretion' must be assessed in deciding the question of double jeopardy."

Implicit in the Stewart opinion, as well as explicit in *Gori,* is the proposition that if the mistrial was declared with the intention of benefiting the defendant, the defendant may claim no prejudice.

I agree with Justice Harlan's criticism of that position expressed at 483:

". . . we think that a limitation on the abuse-of-discretion principle based on an appellate court's assessment of which side benefited from the mistrial ruling does not adequately satisfy

the policies underpinning the double jeopardy provision. Reprosecution after a mistrial has unnecessarily been declared by the trial court obviously subjects the defendant to the same personal strain and insecurity regardless of the motivation underlying the trial judge's action."

In a nutshell, Justice Harlan would lift the bar against double jeopardy only for "manifest necessity." Justice Stewart would lift the bar not only for "manifest necessity," but even where there had been an abuse of discretion just so long as the abuse had been motivated by solicitude for the defendant. I subscribe to Justice Harlan's position.

There is, in my judgment, fundamental and abiding value in trying to save the damaged trial as long as there is a real possibility of salvation—in not permitting the ship to be abandoned prematurely—in not aborting for light or transient cause. The captain faced with a possible judicial shipwreck, in performing his duty of exercising sound discretion, is commanded to exhibit not only good faith and generous motivation but also a resourceful perseverance and a steadfast resolve to salvage the salvageable. It is not enough to assuage an aggrieved defendant by assuring him that the trial judge thought he was doing him a favor. It is no undue encumbrance upon the trial court to explore at least with the defendant the question of whether the defendant wishes such a favor. "Manifest necessity" is a tightly circumscribed limitation upon the defense of double jeopardy. I cannot agree that unsolicited solicitude for a defendant is a limitation upon the limited operation of that limitation.

I proceed to apply Justice Harlan's yardstick to the cases at bar.

In appeal number 540, I have no hesitation in holding that there was "manifest necessity" for the trial judge to abort the proceedings. The clear subornation of perjury, perpetrated before the judge's eyes in open court, while the prosecutor was giving his opening statement, made such a decision virtually mandatory. Indeed, I feel

that the rationale of the *Gori* case or of Justice Stewart in *Jorn* only makes unnecessarily complicated the clear resolution of this case. In my judgment, there was "manifest necessity" for the trial judge's action here even if his clear intent had been to benefit the State or to benefit the witness, regardless of whether any benefit was intended for the defendant or not.

Nor do I have difficulty with the contention of the appellant Baker in appeal number 523. A fair reading of the entire exchange between court and counsel immediately preceding the declaration of the mistrial makes patent that the appellant Baker was, in effect, requesting a mistrial. That is dispositive against him of any claim of having later been placed twice in jeopardy.

It is clear, on the other hand, that the co-defendant Whitfield made no motion formally or informally for a mistrial and, indeed, opposed such a move. The trial court was admittedly faced with an awkward situation when two co-defendants pulled in separate directions. It did not, however, in my judgment, persevere sufficiently in exploring whether the juror in question had heard any argument at all or, even in that eventuality, had heard such argument as would be likely to prejudice him against the defendants. It did not explore with defense counsel the possibility of seating an alternate juror. The trial court indicated that it foreswore this possibility out of solicitude for the two black defendants, since the replacement would have worked to remove the only black juror on the panel. I believe that the appellant Whitfield should have been permitted the option of weighing whatever advantage he thought that black juror might have been to him versus the disadvantage of having his trial aborted and having to go through the entire procedure again. Nor do I feel that the trial court gave sufficient consideration to the possibility of severing the two defendants and proceeding with the trial of Whitfield, notwithstanding the mistrial as to Baker. In short, I feel that the trial judge acted precipitously and thereby abused his discretion. Accordingly, I would reverse the order denying the motion to dismiss the indictments as to Whitfield.