UNITED STATES of America,
Appellant,

v.

Albert GOLDSTEIN et al., Appellees.

No. 796, Docket 73–1165.

United States Court of Appeals,
Second Circuit.

Argued April 19, 1973.

Decided May 25, 1973.

See also, D.C., 342 F.Supp. 661.

Michael B. Pollack, Atty., Dept. of Justice (Dennis E. Dillon, Atty., Dept. of Justice, Robert A. Morse, U. S. Atty., E. D. N. Y., L. Kevin Sheridan, Asst. U. S. Atty., on the brief), for appellant.

Thomas J. O'Brien, New York City (Kostelanetz & Ritholz, James M. La Rossa, Joseph E. Brill, New York City, on the brief), for appellees Goldstein, Caesar, Jacobson and Geller.

Jerome Lewis, New York City (H. Elliot Wales, New York City, on the brief), for appellee Wisch.

Before CLARK, Associate Justice,[*] and WATERMAN and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

The United States seeks to appeal from a pre-trial order of the United States District Court for the Eastern District of New York, Jack B. Weinstein, J., dismissing an indictment against appellees on the ground that a mistrial declared in a prior trial on the same indictment was unwarranted, and that reprosecution would violate the double jeopardy clause of the fifth amendment. Under the recently amended Criminal Appeals Act, 18 U.S.C.A. § 3731 (1972–73 Supp.), the Government may appeal from an

> order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

We thus must answer two questions. First, does the language of section 3731 prevent an appeal by the Government? And second, was Judge Weinstein correct in holding that the double jeopardy clause barred a second trial? For reasons which follow, we conclude that an appeal does lie to this court from the order below, and, further, that the indictment was erroneously dismissed. Accordingly, we reverse and remand for further appropriate proceedings.

## I

On January 7, 1972, appellees were indicted in the Eastern District of New York, on 20 counts charging various violations of federal internal revenue laws, 26 U.S.C. §§ 7201, 7206, and conspiracy to violate those provisions.[1] Trial commenced on September 5, 1972, before Judge Orrin G. Judd. Jury deliberation began on the morning of October 5.[2] The jury was excused for the evening after failing to reach a verdict with re-

---

[*] Retired Associate Justice of the Supreme Court of the United States, sitting by designation.

1. Count 5 of the indictment was later dismissed and was replaced by a superseding information.

2. At the outset, the jury's deliberation involved 18 counts, defendants having successfully moved for acquittal on counts 16 and 19.

spect to any defendant on any count. That evening, Judge Judd had a brief exchange with Juror No. 2 (Mrs. Rappaport), which he related to counsel after jury deliberation had recommenced the following morning. As he explained it, she had asked to see him "on a personal matter." The judge had observed her "sniffling" and "quite ill at ease during the day" and he "started commiserating with her on her illness." She replied that she was "all·right" but just felt "incapable."

At 11:30 A.M. on this second—and last—day of deliberation, the jury requested and received a re-reading of the charge. At 3:10, the jury sent a note to the judge stating it was

apparently not able to reach a unanimous verdict on any count except number 20. Please advise.

In discussion with counsel, the judge indicated that he intended to tell the jury to deliberate "another couple of hours," but doubted that he would ask them to come back on Tuesday.[3] Defense counsel first objected to

your Honor saying that they should be returned for deliberation for a couple of more hours because it may well be that what that amounts to is an incarceration against their will

and then pointed out with respect to requiring the jury's return on Tuesday:

There would be Friday night, all day Saturday, all day Sunday, all day Monday. So there would be three full days and four nights of separation during which it would be impossible to avoid pollution of the jury . . . .

Judge Judd then called the jury back into the courtroom and told them that he would ask them "to go back and to consider further and tell me whether further deliberation would be useful," although he pointed out that he did not intend to have them stay "late tonight" or return on the following Tuesday. He then gave what the Government accurately describes as a modified "Allen

charge." Thereafter, defense counsel moved for a mistrial on the ground that the jury was in "deadlock, which apparently is a hopeless one." The motion was denied.

At approximately 5 o'clock, the jury foreman sent a second note, which said:

[A]fter reviewing most of the testimony and raising what arguments and persuasion we could bring to bear, Mrs. Rappaport has insisted that under no circumstances can she vote guilty on any of the Counts.

Judge Judd thereupon stated his view that this meant "a disagreement on seventeen counts" and resolved to "bring the Jury in and see." The jury was brought in; they announced a verdict of not guilty on count 20, involving only appellee Goldstein, and were polled at the Government's request. The judge then asked: "And it's clear that you are in disagreement on the rest of the counts?", to which the foreman replied "I am afraid so." The judge then continued:

I appreciate the time you have put in, the effort that's been made. I might have given a more coercive charge, but I thought it was improper. I think we should respect the conscience of anybody on the Jury.

I would like to keep you for five or ten minutes just to give you a little picture of things behind the scenes. You are entitled to wonder about what happened at all these side bars, and this has been only an income tax case. But it has been an important case for everybody.

You have heard some of the best defense counsel in this City for the last five weeks. The Government attorney is not an ordinary assistant U.S. Attorney. . . .

The judge then went on to disclose, among other things, that the government attorney was from the Organized Crime section of the Justice Department, that defendant Goldstein's tax re-

---

3. The second day of deliberations was a Friday. Monday, October 9, 1972 was Columbus Day.

turns disclosed income from gambling, and that certain defendants had threatened a witness prior to the trial. Counsel took vigorous exception to these comments—a concern which we share—and moved to dismiss the indictment. The motion was denied.

■ The case was set for retrial before Judge Weinstein, but prior to trial, defendants moved to dismiss the indictment principally on the ground of double jeopardy. The judge granted the motion; while his order of January 8, 1973 dismissing the indictment contained no express findings, the bases for the order were carefully stated during the course of the hearing held on the motion. We set these out extensively:

. . . I am particularly impressed with the transcript of October 6, 1972 [the second day of jury deliberation described above] at 5:00 o'clock P.M.

The Court said there is "still disagreement on all but one count." There is no indication that disagreement was fixed or that there could not be some agreement had there been further consultation. There were 18 counts undisposed of at that time. Many of them involved a number of defendants and all of them involved at least two defendants.

The Jury was then polled on Count 20 and the defendant in that count was found not guilty. There's no inquiry made by the Court as to whether the Jury wished to consult further with each other. There is no indication that they disagreed with respect to each defendant on each count. In fact, it is not clear that they had considered in any detail each defendant as to each count.

Immediately after the Jury was polled, the Judge began to address the Jury and there would be nothing from which their counsel could determine the nature of the remarks that would be made up until line 15 of page 6 of the transcript. Then reference is made to the organized crime section of the Department of Justice. Thereafter very quickly there is reference to highly prejudicial material which undoubtedly had taken counsel by surprise and it would be only at that point I would think that the normal practice was not going to be followed, that inquiry was not going to be made to the Jury with respect to whether they might possibly reach an agreement given more time or whether they might possibly reach an agreement on any of the counts as to any of the defendants.

\* \* \*

I must reluctantly conclude that the Court acted without proper consultation with the attorneys and without proper consultation with the Jury and that the case was improperly taken from the Jury at this point without the consent of the defendants and before it had been determined that no agreement could be reached.

Under the circumstances, therefore I reluctantly find that defendants should be placed in double jeopardy if they were to be tried . . . .

From the subsequent order dismissing the indictment, the Government appeals.[4]

## II

■ At the outset, appellees claim that the Government cannot appeal from Judge Weinstein's order dismissing the indictment on double jeopardy grounds.

---

4. The statute, 18 U.S.C.A. § 3731, provides that:
> The appeal . . . shall be taken within thirty days after the . . . order has been rendered and shall be diligently prosecuted.

The Government's notice of appeal was filed on February 1, 1973, within 30 days of Judge Weinstein's order dated January

8. The Government's brief, however, was not filed until March 12, nearly six weeks after the notice of appeal. In view of the statutory command of diligent prosecution, we believe that the Government's brief in appeals of this sort should ordinarily be filed within 30 days after the notice of appeal. Cf. Local Appellate Rule § 34(f).

The 1970 amendments to the Criminal Appeals Act, enacted as Title III, § 14 of the Omnibus Crime Control Act of 1970, P.L. 91–644, 84 Stat. 1880, 1890, 91st Cong., 2d sess., U.S.Code Cong. & Admin.News 1970, p. 5804, were designed to eliminate much of the tortuous statutory construction, e. g., United States v. Sisson, 399 U.S. 267, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970), and United States v. Apex Distributing Co., 270 F.2d 747 (9th Cir. 1959) (en banc), to which federal courts had been put in interpreting the coverage of the predecessor act. See S.Rep. No. 91–1296, 91st Cong., 2d sess., at 2 (1970). But a principal purpose of the amendments was to broaden considerably those situations in which the Government could appeal. Id.[5] While the predecessor act was to be strictly construed against the Government's right to appeal, e. g., United States v. Sisson, *supra,* 399 U.S. at 291, 90 S.Ct. 2117, the present statute expressly directs that its provisions "shall be liberally construed to effectuate its purposes."

Appellees do not—and cannot—dispute this reading of statutory purpose. They contend, nonetheless, that the plain language of the 1970 amendments forecloses our appellate jurisdiction. Any need to undertake a detailed refutation of this assertion has been obviated by this court's recent opinion in United States v. Castellanos, 478 F.2d 749, 750 (2d Cir. 1973). Like this case, *Castellanos* involved an appeal from an order dismissing an indictment on grounds of double jeopardy prior to the impaneling of a new jury. In holding that order appealable, *Judge Smith* observed that such an order was plainly appealable under the predecessor statute in light of United States v. Jorn, 400 U.S. 470, 91

S.Ct. 547, 27 L.Ed.2d 543 (1971), and that "[n]othing in either the legislative history *or the language* of the new statute . . . indicates the slightest intention to cut back the scope of former § 3731. Indeed, quite the opposite seems true . . . ." (Emphasis added.)[6] The same conclusions govern here.

Appellees further contend, however, that Judge Weinstein's dismissal was, "as a matter of substantive law, tantamount to an acquittal." There is no merit to the argument. United States v. Hill, 473 F.2d 759 (9th Cir. 1972), on which appellees rely, is not in point. *Hill* involved indictments charging the sending of obscene advertisements through the mail. Defendants' motion to dismiss the indictments was granted on the ground that the advertisements were not obscene as a matter of law. In finding reprosecution prohibited by the double jeopardy guarantee, the court noted that the judge had received evidence limited to a necessary element of the offense; the dismissal thus decided the general issue of guilt and was the equivalent of a directed acquittal. See United States v. Sisson, supra, 399 U.S. at 290 n. 19, 90 S.Ct. 2117; United States v. Ponto, 454 F.2d 657, 663–664 (7th Cir. 1971) (en banc). Judge Weinstein's dismissal, by contrast, in no sense turned on the general issue of guilt or required the taking of evidence remotely related to any element of the crime.[7]

Thus, the Government's appeal is properly before us, and appellees' motion to dismiss the appeal is denied.

### III

We turn now to the merits of Judge Weinstein's dismissal order. Plainly, technical jeopardy had attached

---

5. The amendments also eliminated direct appeals to the Supreme Court, lightening the caseload of the Court. S.Rep., supra, at 13–18.

6. In addition to Judge Smith's persuasive analysis, see S.Rep., supra, at 7–9, 12, which details the reasons for the change in language.

7. Appellees also rely on United States v. Oppenheimer, 242 U.S. 85, 87–88, 37 S.Ct. 68, 61 L.Ed. 161 (1916), but the case is patently inapposite on its facts and rationale.

in the trial before Judge Judd because the jury had been impanelled, but equally plainly, as a century and a half of cases illustrate, that did not end the matter. See United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824); Illinois v. Somerville, 410 U.S. 458, 461, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425 (1973). What would have ended the matter, however, was defendants' consent to Judge Judd's order declaring a mistrial. See United States v. Gori, 282 F.2d 43, 47 & n.5 (2d Cir. 1960), aff'd, 367 U.S. 364, 81 S.Ct. 1523, 6 L.Ed.2d 901 (1961); cf. United States v. Jorn, supra, 400 U.S. at 485, 91 S.Ct. 547. We conclude that defendants did so consent.

On the afternoon of the second day of deliberation, the jury notified Judge Judd that it was "apparently not able to reach a unanimous verdict on any count except number 20"; the judge then gave a modified "Allen charge." Defense counsel immediately moved for a mistrial because the jury was hopelessly deadlocked. Had the judge granted this request, of course, no meritorious double jeopardy claim could later have been made. See United States v. Tateo, 377 U.S. 463, 467, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964). We are at a loss to understand what transpired thereafter to breathe life into such a claim. Defendants argue that the situation was completely changed less than two hours later by the jury's second note. At that point, according to defendants, counsel realized that they had a favorable jury, that "at worst there would be a hung jury," and that they "decided they did not want a mistrial."[8] The initial problem with this position is that defense counsel did not communicate this change in attitude to Judge Judd. Defendants

now argue, as they successfully did before Judge Weinstein, that they never had an effective chance to make their new position known to Judge Judd. We do not understand why that is so, as a recounting of the events of that afternoon indicates.

After the judge read the second note to defense counsel, he stated that this "means a disagreement on seventeen counts. We will bring the Jury in and see." The jury then came back to the courtroom and reported its verdict of not guilty on count 20; each juror was then polled on that verdict. On completion of the polling, the foreman confirmed to the judge that the jury was "in disagreement on the rest of the counts." As anyone familiar with trial court procedure knows, all of this took considerable time. It was certainly sufficient for defense counsel, whose performance up to that time had not been marked by excessive timidity, to make their changed views known to the court. Nor was that all. Judge Judd did not immediately launch into his behind-the-scenes discussion which, defendants correctly maintain, made it impossible for the same jury to continue. Instead, the judge took another moment or two in introductory remarks—at which point his intention to order a mistrial became plain—before characterizing the government attorney as "not an ordinary assistant," but from "the section on Organized Crime." This interlude gave defense counsel yet another chance to say that they did not want a mistrial. It is thus apparent to us that defense counsel had adequate opportunity to disabuse the judge of the idea that they still wanted the jury discharged because it was deadlocked; Judge Weinstein's contrary view is not supportable.[9]

---

8. Brief for Appellees Goldstein, et al., at 14.

9. Toward the end of the morning session of the hearing, Judge Weinstein stated:
 [A] mistrial was granted here at a time when the defendants . . . would have opposed it had they been given an adequate opportunity to be heard.

In the course of his remarks set forth earlier in this opinion, he again commented that Judge Judd had acted "without proper consultation with the attorneys . . . ." Even if this be a finding of fact, we believe that it must be set aside, regardless of whether the "clearly erroneous" standard applies. We doubt that it does, however. While the "clearly

Judge Judd obviously assumed that defendants continued to favor mistrial. Certainly, he would not have proceeded as he did had he thought the trial was to continue before the same jury. There was ample warrant for the judge's assumption. Less than two hours before, defense counsel had characterized a proposed instruction to the jury to deliberate "for a couple of more hours" as "incarceration against their will," and had opposed requiring the ·jury to continue after the weekend recess because "it would be impossible to avoid pollution of the jury." In addition, the judge's assumption as to defendants' position was buttressed by common sense. When defendants had earlier moved for a mistrial, they had no way of knowing the jury's vote: It might have been anything from 11–1 for acquittal to 11–1 for conviction. Any one of these possibilities except the last would indicate a jury sentiment more—rather than less—favorable than the 11–1 vote for conviction on all remaining counts revealed by the jury's second note. To all appearance, defendants' position had worsened in the time between the first and second notes. Defendants argued before Judge Weinstein, however, that they were then in a better position because they knew that they could not be hurt, and that

> They could only get a hung jury and it is possible, as it happens in the movies at any rate, that one person can change the minds of eleven other people.

Anything is possible, of course, but the self-serving nature of this hindsight as-

sertion is patent. Moreover, the silence of defense counsel on this issue was even more deafening after Judge Judd had discharged the jury. At that point, defense counsel argued at length that the judge's disclosure of material not in evidence had hopelessly prejudiced defendants, and required dismissal of the indictment. But this claim itself assumed that another trial would be held, a position inconsistent with their present contention that the double jeopardy clause would bar such a trial, because the discharge of the jury had been premature.

■ We disagree, therefore, with Judge Weinstein's belief that a mistrial was declared without defendants' consent.[10] Consent need not be express, but may be implied from the totality of circumstances attendant on a declaration of mistrial. United States v. Gori, supra, 282 F.2d at 46; see Scott v. United States, 91 U.S.App.D.C. 232, 202 F.2d 354, cert. denied, 344 U.S. 879, 73 S.Ct. 176, 97 L.Ed. 681 (1952); cf. Raslich v. Bannan, 273 F.2d 420 (6th Cir. 1959) (per curiam). Defendants had moved for a mistrial a scant two hours before one was declared, at the first suggestion of jury deadlock; little, if anything, had occurred thereafter to warrant a belief that their position had changed; and even if it had, they failed to make this change in position known to the trial judge notwithstanding adequate opportunity to do so. See United States v. Pappas, 445 F.2d 1194, 1199–1200 (3d Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 449, 30 L.Ed.2d 368 (1971).[11]

erroneous" standard is applicable to analogous findings in criminal cases, see 8A Moore's Federal Practice ¶ 41.09, at 97, Judge Weinstein's view as to the "opportunity to be heard" turned on his reading of the trial transcripts, and these are as available to us as they were to him. Cf. In Matter of Beck Industries, Inc., 479 F.2d 410, 412 n. 3 (2d Cir. 1973), and authorities there cited.

10. Indeed, the record before us is somewhat contradictory as to whether such a finding was in fact made. Judge Wein-

stein made such a comment at the hearing. On the other hand, in his subsequent order after stating that "the case was improperly taken from the jury," the judge deleted additional language proposed by defendants, i. e., that this was "without the consent of the defendants and before it had been determined that no agreement could be reached . . . ."

11. We need not go so far as to hold that in the absence of an express objection to discharging the jury, consent is, in effect, to be presumed, see United States v. Phil-

Under these circumstances, their consent to mistrial can be properly implied, Judge Judd did not really act sua sponte, and defendants cannot successfully argue double jeopardy.

## IV

In what may be an excess of caution, we turn finally to the argument made by the Government that, even if defendants did not consent to the mistrial, reprosecution was consistent with the policies served by the double jeopardy clause.

■ In deciding to abort a criminal trial short of a verdict and without a defendant's consent, after jeopardy has attached, the trial judge is typically afforded "broad discretion," Illinois v. Somerville, supra, 410 U.S. at 462, 93 S.Ct. at 1069, since he is "best situated intelligently to make such a decision," Gori v. United States, 367 U.S. 364, 368, 81 S. Ct. 1523, 1526, 6 L.Ed.2d 901 (1961). On the other hand, it is recognized that the double jeopardy clause of the fifth amendment safeguards the defendant's "valued right to have his trial completed by a particular tribunal," Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949), which "he might believe to be favorably disposed to his fate," United States v. Jorn, supra, 400 U.S. at 486, 91 S.Ct. at 558, 27 L.Ed.2d 543. With due regard for this right, as well as for other defendant interests served by the double jeopardy clause, see Note, Double Jeopardy: The Reprosecution Problem, 77 Harv.L.Rev. 1272, 1274 (1964), the Supreme Court has limited that discretion and has occasionally held a second prosecution barred where a trial judge sua sponte and mistakenly had declared a mistrial. See United States v. Jorn, supra; Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963). In defining standards for the exercise of discretion in this sort of case, the Court has continually adhered to the formulation of Justice Story in United States v. Perez, 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824):

> [T]he law has invested Courts of justice with the authority to discharge a jury from giving a verdict, whenever, in their opinion, taking all the circumstances into consideration, there is manifest necessity for the act, or the ends of public justice would otherwise be defeated.

Beyond these general guidelines, the Court has emphasized, each case must turn on its own facts. E. g., Illinois v. Somerville, supra, 410 U.S. at 462, 93 S. Ct. at 1069.

■ Turning to the facts in this case, *Perez* itself and Logan v. United States, 144 U.S. 263, 297–298, 12 S.Ct. 617, 36 L.Ed. 429 (1892), among others, establish that a jury's genuine inability to agree on a verdict constitutes "manifest necessity" warranting the declaration of a mistrial. See United States v. Lansdown, 460 F.2d 164, 168 (4th Cir. 1972). Requiring a jury to continue deliberations despite genuine and irreconcilable disagreement more often than not defeats the ends of public justice; not only will such compulsion needlessly waste valuable judicial resources, it may coerce erroneous verdicts. On this view of the case, the only question presented to us, therefore, is whether Judge Judd abused his discretion in concluding when he did that the jury was in fact genuinely hung.

■ The question is a close one. Judge Weinstein believed that Judge Judd had erred because the trial had been lengthy; the evidence and factual issues were complex, as demonstrated by the jury's request to have the charge reread; the jury had only deliberated eight hours even though there were almost 50 possible verdicts to render and no indication that agreement was impossible as to all. Finally Judge Weinstein felt that no sufficiently in-depth at-

---

lips, 431 F.2d 949 (3d Cir. 1970); we believe instead that the failure to object

is one of the several probative factors here from which consent may be implied.

tempts had been made, in accord with "the normal practice," to ascertain the scope of disagreement among jurors, or to determine whether further deliberation might produce some agreement. These are appropriate factors to consider. See ABA, Project on Minimum Standards for Criminal Justice, Trial by Jury § 5.4(c) (approved draft 1968); id. at 156–57.

 Nonetheless, "taking all the circumstances into consideration," as *Perez* requires, we are left with the firm conviction that Judge Judd committed no error. The complexity of a case and the amount of time requested by 12 reasonable jurors to reach unanimity on some or all of many possible verdicts are determinations best left to a trial judge and are difficult to gauge by another district judge or by appellate judges on a cold record. The jury twice reported itself unable to agree—in the second instance, less than two hours after the first and after a modified Allen charge in which the judge had instructed the jury to tell him "whether further deliberation would be useful." The second note itself appears to answer the question in the negative and suggests growing frustration on the part of the jurors. Indeed, the second note and final oral response of the jury foreman were unequivocal in tone: Mrs. Rappaport could vote guilty "under no circumstances" and it was "clear" that they were in disagreement on all counts. With the dissenting juror so identified, Judge Judd was entitled to recall his conversation with her on the previous evening, and to conclude that her previously vague reference to feeling "incapable" meant that she was in fact unable or unwilling to vote guilty.

Appellees call our attention to but one case in which the trial court's erroneous decision to order mistrial due to an apparently hung jury has been held to bar reprosecution. United States v. Lansdown, supra. Our research has disclosed no other federal case. But cf. Commonwealth v. Baker, 413 Pa. 105, 196 A.2d 382 (1964) (premature discharge of jury bars retrial on state constitution double jeopardy ground). This itself suggests how rarely the informed judgment of a trial court is disturbed in these or similar circumstances. Moreover, factual differences between this case and *Lansdown* are striking. In *Lansdown*, the trial judge ordered a mistrial solely because he felt that the many hours of jury deliberation after a one-day trial had been long enough.[12] The court of appeals noted that no rule of thumb in terms of hours deliberated could be extrapolated from precedent. 460 F.2d at 169 & n.2. Of far more significance, however, the jury foreman had told the *Lansdown* trial judge, immediately before mistrial was declared, that they were "on the verge" of a verdict; another juror took it upon himself to request an additional ten minutes of deliberations. In light of this, the trial judge's action was arbitrary and manifestly an abuse of discretion. In this case, on the other hand, no member of the jury ever suggested that any verdict was remotely possible. We believe that Judge Judd could have reasonably concluded that the jury was hopelessly deadlocked.[13] If so, it follows that there was manifest necessity for declaring a mistrial and that doing so was not an abuse of discretion.

Reversed and remanded for further proceedings consistent with this opinion.

12. The trial judge referred to "20 hours" of deliberation. The court of appeals pointed out, "In fact, the jury had deliberated slightly in excess of 11 hours." 460 F.2d at 168 n. 1.

13. Cf. the standard proposed by § 5.4(c) of the ABA Minimum Standards, supra, defining the scope of a trial judge's discretion to declare a mistrial sua sponte:

> The jury may be discharged without having agreed upon a verdict if it appears that *there is no reasonable probability of agreement.*

(Emphasis added.)