# JOURDAN *v.* STATE OF MARYLAND

[No. 187, September Term, 1974.]

*Decided July 9, 1975.*

496

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Barry J. Renbaum,* with whom was *Alfred J. O'Ferrall, III, Deputy Public Defender,* on the brief, for appellant.

*David B. Allen, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Clarence W. Sharp, Assistant Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *David K. Rumsey, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

ELDRIDGE, J., delivered the opinion of the Court. SMITH, J., dissents and filed a dissenting opinion at page 512 *infra.*

In the course of petitioner's trial on charges of storehouse breaking and forgery, the prosecuting attorney became ill and could not carry on. Shortly thereafter, another attorney in the State's Attorney's office appeared and requested a continuance or, if the defendant would consent, a mistrial. The trial judge, *sua sponte,* declared a mistrial. The question presented is whether, under all of the circumstances of the case, the later retrial of petitioner on the same charges violated the double jeopardy clause of the Fifth Amendment to the United States Constitution.

Petitioner James Mitchell Jourdan, Jr., was arrested in January 1971 and indicted by the Prince George's County grand jury in March 1971, on charges of storehouse breaking. Jourdan, being detained in the disciplinary wing of

the State penitentiary prior to trial, was anxious to be tried as expeditiously as possible, and during the pre-trial period he sent motions and several letters to judges of the Circuit Court for Prince George's County, to federal courts and to other agencies, seeking a speedy trial. The storehouse breaking charge, as well as three other cases against Jourdan, were then scheduled to be tried on May 21, 1971.

The various cases were called for trial as scheduled on Friday, May 21, 1971, at 1:20 p.m. The prosecuting attorney was the Deputy State's Attorney for Prince George's County, and the cases had been transferred to him from another attorney in the State's Attorney's office just a short time before, after the conclusion of a criminal case which the Deputy State's Attorney had been handling that morning. He later stated that he had spent about ten or fifteen minutes reviewing the files, but that this was sufficient time to familiarize himself, and that more preparation was not required for this particular trial. Jourdan was represented by an attorney appointed by the court.[1]

At the beginning of the proceedings, the Deputy State's Attorney moved that the court continue the cases, other than case 11,137 (the storehouse breaking charges), which had been scheduled for trial that day. Jourdan's attorney objected, stating: "In all of these cases there has been filed a motion for speedy trial. The matters have been continued at prior times and the defendant is here ready to be tried today and he is ready to proceed to trial today, so I would object to a continuance or a motion for continuance." In light of the objection the prosecuting attorney withdrew the motion for continuance.

The State then moved to consolidate case number 11,137 (storehouse breaking) with case number 11,147 (forgery and uttering of a check taken during the storehouse breaking); the defense concurred in the motion; and the motion was granted. Next, the State nolle prossed case number 10,634 (a

---

1. This was seven months prior to the effective date of the Maryland Public Defender Act, Maryland Code (1957, 1971 Repl. Vol., 1974 Supp.), Art. 27A, and therefore attorneys to represent indigent criminal defendants were still being appointed by the court in Prince George's County.

charge of housebreaking). The remaining case was number 11,073 (attempted escape), which was unrelated to numbers 11,137 and 11,147 (the storehouse breaking and forgery charges), and which the State again suggested should be continued. The defense again objected to a continuance, indicating that while the attempted escape case should not be consolidated with the others, it should be tried at the conclusion of the trial of the storehouse breaking and forgery charges. The court took the State's motion for a continuance under advisement, stating that it would be disposed of after the first trial.[2]

Jourdan pleaded "not guilty" to the storehouse breaking and forgery charges; the jury was selected and sworn; the witnesses were sequestered; the State's opening statement was made; and the State's first witness was called and began to testify. After a few minutes of direct examination of the first witness, the Deputy State's Attorney asked if counsel could approach the bench, and, out of the hearing of the jury, indicated that he was ill. The court took a recess, and the Deputy State's Attorney left the courtroom. This was at 2:10 p.m.

Fifteen minutes later the proceedings resumed with a bench conference out of the hearing of Jourdan. The State was represented by an Assistant State's Attorney, who stated to the court:

> "Yes, Your Honor, so that we can continue with the case at a later date, so as not to pose a problem of double jeopardy we would ask that if the defendant at this time would consent to a mistrial then if the Court could recess the case, continue this case until next week when Mr. Femia [the Deputy State's Attorney] would be free to return and then try the case; continue with the case as it would recess the matter."

---

2. Later, however, while the jury for numbers 11,137 and 11,147 was being selected, the court indicated to the clerk that it would not be necessary to have any jurors available for the disposition of the attempted escape case "because I am not going to start any additional trials today. We do not have any time or inclination to do it at this time."

The court then asked the defense attorney to comment, and Jourdan's attorney responded, "The only comment I have, I do not think that it would be appropriate for the case to be continued . . . ." The court then declared a mistrial, saying:

"Very well. The court understands your motion and *you request a consent and the court can understand why* . . . [*the defense attorney*] *does not comment on that* because of the complexity of this defendant with the various names and various cases. *There is no indication he voluntarily consents, but the court is going to declare a mistrial* for the simple reasons it is very obvious. You do not have the background Mr. Muskus [the Assistant State's Attorney]. It took us a considerable amount of time to get the whole situation into the appropriate complexion for its disposition and this is the last day for this jury for some substantial period of time. If I recess the case it would necessitate them coming back in when they were not assigned as jurors. They cannot be used in any other jury case while this was recessed. The court under the circumstances would declare a mistrial in this case and the reason is the State's Attorney's office cannot proceed further and Mr. Femia, the assigned State's Attorney for this trial having become physically incapacitated at 2:30 in the afternoon, the last day this jury panel is here, thus I declare a mistrial in the trial of Criminal Trials Nos. 11,137 and 11,147." (Emphasis supplied.)

The Assistant State's Attorney again raised the question that the defendant "would contend there would be no grounds for a mistrial" and "would claim at a later date . . . a problem of double jeopardy." In reply the following colloquy took place at the bench:

"THE COURT: Mr. Muskus, I would like you to tell me how it is trouble. The court has the right to declare mistrial when it does not appropriately call for the continuance of a trial. I am exercising that

discretion under the circumstances and as I understand there is no opposition to the court declaring a mistrial under the circumstances.

"THE DEFENSE ATTORNEY: Under the circumstances.

"THE ASSISTANT STATE'S ATTORNEY: So as far as the defendant is concerned there is no problem declaring a mistrial, is that correct?

"THE DEFENSE ATTORNEY: That is correct."

The court directed the prosecuting attorney and the defense attorney to proceed to the State's Attorney's office and arrange for a new trial date.

Because the above proceedings were out of Jourdan's hearing, the prosecuting attorney raised again the matter of the defendant's consent, but his consent was not obtained. The record reveals the following:

"THE ASSISTANT STATE'S ATTORNEY: Your Honor, just for one additional precaution *could we also have the defendant himself state that he would —*

"THE COURT: . . . *the court has disposed it as mistrial.*

"THE ASSISTANT STATE'S ATTORNEY: We just want to make sure there is no problem at a later date.

"THE COURT: I am telling you gentlemen to bring it back down to me. Go back and list your calendars, and reschedule this case as soon as possible. If you gentlemen cannot resolve it within sensibility I will be back in my office very shortly. I will be available.

(Whereupon, counsel returned to the trial table and the following proceedings were had within the hearing of the jury:)

"THE COURT: Madam Reporter, for the record, when Mr. Muskus came up to the bench the record

will show, after the recess, Mr. Muskus came in representing the State's case, and you also will make a docket entry, Madam Clerk.

"Very well, Mr. Foreman, ladies and gentlemen of the jury, now that you will not be sitting in judgment on this case the Court will make one observation. Today has been a real rough day all the way around. What happened, you all observed. Mr. Femia has been taken to the lounge in the State's Attorney's office and the court has determined this case cannot be proceeded today *and I have declared what we identify as a mistrial."* (Emphasis supplied.)

The proceedings on May 21, 1971, were concluded at 2:30 p.m.

Jourdan's second trial on cases 11,137 and 11,147 commenced on September 7, 1971. The State nolle prossed all counts of number 11,137 (storehouse breaking) except for the first count. The jury found Jourdan guilty on the first count of number 11,137, which was storehouse breaking with intent to steal goods with a value exceeding one hundred dollars. The jury acquitted him of all counts in number 11,147. Subsequently, Jourdan was sentenced to six years' imprisonment, commencing as of January 19, 1971. At no time between the first and the second trial, or during the second trial, did Jourdan's attorney move to dismiss on the ground of double jeopardy or raise the double jeopardy issue. An appeal was taken, although the double jeopardy question was not raised on appeal. The Court of Special Appeals affirmed the storehouse breaking conviction in an unreported opinion, and this Court denied a petition for a writ of certiorari, 266 Md. 738.

On June 5, 1973, Jourdan, in proper person, filed a petition for post conviction relief. Shortly thereafter Jourdan, represented by a new attorney assigned by the Public Defender's office, filed an amended petition. The principal contentions in the amended petition were that Jourdan had been denied the right to a speedy trial and that his second

trial, following the declaration of a mistrial, was in violation of his constitutional right not to be twice put in jeopardy for the same offense. As amended again later, the petition for post conviction relief also set forth the claim that the failure of Jourdan's attorney to raise the double jeopardy defense amounted to a denial of the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution.

A hearing on the post conviction petition was held by the Circuit Court for Prince George's County (Taylor, J.) on November 26, 1973. At the hearing, testimony was heard from the Deputy State's Attorney who initially handled the prosecution at Jourdan's first trial and who became ill, by the Assistant State's Attorney who represented the State after the recess at the first trial, by the attorney who represented Jourdan at the first and second trials as well as on the appeal, and by Jourdan himself.

The Deputy State's Attorney testified that Jourdan's was his sixth trial that week, and that the matter was assigned to him shortly before the trial began, as he had concluded the case he was handling that morning. He further testified that the presence of the State's witnesses had already been arranged, and that ten or fifteen minutes' preparation was all that he needed for the trial. Finally, he explained that he had become faint during his questioning of the first witness, that he approached the bench, and that he did not remember what happened between that time and when he found himself on a couch in the State's Attorney's office. He stated that his physician diagnosed his illness as exhaustion, and that he returned to work about a week later.

The Assistant State's Attorney, who represented the State at the first trial after the illness of the Deputy State's Attorney, testified at the post conviction hearing that at the time of the first trial he was experienced in prosecuting storehouse breaking cases and that he had prosecuted "just about every major felony case." He testified that when the Deputy State's Attorney became ill during Jourdan's trial, he was instructed by the State's Attorney to request a

continuance. He said that as soon as the proceedings resumed following the Deputy State's Attorney's illness, he and the defense counsel approached the bench, that he did not request a mistrial because he would not request one without the consent of defense counsel, and that the judge "on his own motion declared a mistrial in the case." He further testified that, after the judge declared a mistrial, he requested that the defense agree to the mistrial, but "[t]he defendant would not consent." He went on to testify that the defense attorney "was reluctant" to consent to a mistrial. The Assistant State's Attorney concluded his testimony by stating that he was "very persistent" in his "effort to have the defendant personally consent to the mistrial because [he was] ... concerned with the issue of double jeopardy" but that "the court had informed me that it had already ruled ... in the matter that a mistrial would be granted, that there was no need for my insistence or persistence in the matter to get the defendant's request or consent . . . ."

The attorney who represented Jourdan at his first and second trial, as well as on the appeal from his conviction, testified at the post conviction hearing that the judge at the first trial declared a mistrial on his own motion, that Jourdan did not "personally concur" with the declaration of a mistrial, and that "[h]e wanted to know why we weren't going to trial. I tried to explain to him why we weren't." He confirmed that the proceedings after the recess relating to the declaration of a mistrial took place at the bench, out of the hearing of Jourdan.

The last witness at the post conviction hearing was Jourdan. Initially, Jourdan testified concerning the numerous letters and motions which, before his trial, he had sent to judges, courts, the Legal Aid Bureau and attorneys, seeking a speedy trial because "I was being held in the south wing of the Maryland Penitentiary without a conviction." He stated that, for the same reason, he did not on May 21, 1971, want a continuance or a mistrial. All of his witnesses were present, and he wanted to be tried. As to whether he understood what was going on and objected, the following appears:

"A. The Honorable Judge called the jury back and told them they could go home.

"Q. I see. Did you fully understand what was going on, on the 21st of May?

"A. Yes, sir, I knew that I had to go back to the south wing of the penitentiary because they wouldn't hear my case.

"Q. Did you object to that?

"A. I made numerous objections to my lawyer, telling him I didn't want no continuance. I was tired of being continued. I had been continued for . . . months."

Later in the hearing, Jourdan reiterated that he at no time consented to a mistrial.[3]

At the conclusion of the post conviction hearing, Judge Taylor delivered an oral opinion, holding that Jourdan had not been denied his right to a speedy trial. With respect to the question of double jeopardy, Judge Taylor found that Jourdan "did not consent to the granting of the mistrial" and that the court on May 21, 1971, granted the mistrial on its own.

Judge Taylor further found, based upon the testimony of the Deputy State's Attorney and the Assistant State's Attorney, that the practice in the State's Attorney's office at the time of Jourdan's first trial was that if a judge became available to try a case scheduled for that day, and if the member of the State's Attorney's staff who was assigned the case was engaged in another matter, and if another member of the State's Attorney's staff became available to prosecute the case, the case "will be pulled from the person originally assigned it, and then it would be tried by the [member of the] State's Attorney['s staff] that is free and available." Judge Taylor found that in accordance with this practice, the

---

**3.** Although repeatedly answering in the negative whenever he was asked whether he consented to a continuance or to a mistrial, Jourdan's testimony suggested that he did not appreciate the difference between the two. He was merely aware that either would result in his not being tried on May 21, and he wanted the trial to go forward on that date.

Deputy State's Attorney on May 21, 1971, received Jourdan's cases from another member of the State's Attorney's staff to whom the cases had been assigned, that he ascertained that all witnesses were present, and that he took ten minutes to review the matter and then proceeded to trial. Judge Taylor went on to find that when the Deputy State's Attorney became ill, another Assistant State's Attorney, Mr. Muskus, was available and could have similarly handled the trial that day. He further found that it was not too late in the day to have proceeded with the trial. Judge Taylor concluded "that the court committed error in granting a mistrial *sua sponte*." Consequently, he held that Jourdan's retrial violated the prohibition against double jeopardy.

While finding that there was no consent to a mistrial, and that there was no "evidence to indicate that he [Jourdan] was personally and individually aware of the right to raise the issue of [double] jeopardy," Judge Taylor indicated that he was concerned about granting relief to Jourdan on double jeopardy grounds because of the failure of Jourdan's court appointed attorney to raise the double jeopardy issue after the first trial. However, he held that the failure of Jourdan's attorney to raise the double jeopardy issue in connection with the second trial, particularly after being alerted to the issue by the Assistant State's Attorney at the first trial, constituted inadequate representation by counsel.

In a subsequent written opinion and order, filed December 17, 1973, Judge Taylor stated that the attorney's "failure to raise the [double jeopardy] issue leads this court to conclude that Mr. Jourdan was denied the effective assistance of counsel." It was ordered that the conviction and sentence in number 11,137 be set aside.

The State applied to the Court of Special Appeals for leave to appeal from the order setting aside Jourdan's conviction. In an unreported per curiam opinion, the court granted the application and transferred the case to its regular appeal docket. Thereafter, the Court of Special Appeals, holding that the declaration of a mistrial during Jourdan's first trial was "manifestly necessary," and that, therefore, his retrial

did not twice place him in jeopardy, reversed the order of December 17, 1973, setting aside Jourdan's conviction. *State v. Jourdan,* 22 Md. App. 648, 325 A.2d 164 (1974). This Court then granted a writ of certiorari to review the reversal of the order setting aside Jourdan's conviction.[4]

As we have pointed out on many recent occasions, since the Supreme Court's decision in *Benton v. Maryland,* 395 U. S. 784, 89 S. Ct. 2056, 23 L.Ed.2d 707 (1969), the prohibition against twice placing a criminal defendant in jeopardy is applicable in this State as a constitutional matter, by virtue of the Fifth and Fourteenth Amendments to the United States Constitution, whereas prior to *Benton* it was held applicable in Maryland only as a common law principle. *See Blondes v. State,* 273 Md. 435, 442-443, 330 A. 2d 169 (1975); *Neal v. State,* 272 Md. 323, 327, 322 A. 2d 887 (1974); *Cornish v. State,* 272 Md. 312, 316, 322 A. 2d 880 (1974); *Matter of Anderson,* 272 Md. 85, 92-93, 321 A. 2d 516, *appeal dismissed,* 419 U. S. 809, 95 S. Ct. 21, 42 L.Ed.2d 35 (1974); *Pugh v. State,* 271 Md. 701, 704-705, 319 A. 2d 542 (1974). Being a constitutional question, the contention that a defendant's rights under the Fifth Amendment's double jeopardy clause were violated may now be raised under the Post Conviction Procedure Act, Code (1957, 1971 Repl. Vol., 1974 Cum. Supp.), Art. 27, § 645A. *See Jordan v. Warden,* 9 Md. App. 485, 265 A.2d 568 (1970).

In its appeal to the Court of Special Appeals, the State made no claim that Jourdan waived his double jeopardy contention because his attorney failed to raise the issue before or at the beginning of the second trial, and the Court of Special Appeals stated that "we shall assume, but do not specifically so decide," that the issue was not waived (22 Md. App. at 656). And in this Court the State does not contend that the double jeopardy question was waived. The Post

---

4. Under Maryland Code (1974), § 12-202(1) of the Courts and Judicial Proceedings Article, this Court has no jurisdiction to review a decision of the Court of Special Appeals granting or denying leave to appeal in a post conviction proceeding. However, once the Court of Special Appeals grants leave to appeal in such a case and transfers the case to its appeal docket, the matter takes the posture of a regular appeal, and we do have jurisdiction under § 12-201 of the Courts and Judicial Proceedings Article to review the Court of Special Appeals' decision on the appeal itself.

Conviction Procedure Act, as amended by Ch. 442 of the Acts of 1965, adopts the definition of waiver of a constitutional right set forth in *Johnson v. Zerbst*, 304 U. S. 458, 464, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461, 146 A.L.R. 357 (1938), and *Fay v. Noia*, 372 U. S. 391, 439, 83 S. Ct. 822, 849, 9 L.Ed.2d 837 (1963), namely that the petitioner himself "intelligently and knowingly" failed to raise the issue before or at his trial, Art. 27, § 645A (c). *See Bristow v. State*, 242 Md. 283, 289, 219 A. 2d 33 (1966). There is no support in the record in this case for holding that Jourdan before or at the time of his second trial was aware of and understood the possible defense of double jeopardy; the evidence is all to the contrary. Consequently, we shall proceed on the basis that there was no waiver because of the failure to raise the double jeopardy issue prior to or at the beginning of Jourdan's second trial.[5]

It is clear that at the time the mistrial was declared on May 21, 1971, jeopardy had attached to Jourdan, as the jury had been empaneled and sworn. In fact, the first witness had begun to testify.[6] However, as Mr. Justice Rehnquist stated for the Court in *Illinois v. Somerville, supra,* 410 U. S. at 467-468:

> " . . . in cases in which a mistrial has been declared prior to verdict, the conclusion that jeopardy has

---

5. Of course, a holding of waiver would only present the question, decided by Judge Taylor, of whether the attorney's failure to raise the double jeopardy issue, after being alerted to it by the Assistant State's Attorney at the first trial, amounted to a denial to Jourdan of the effective assistance of counsel in violation of the Sixth Amendment.

6. "In the case of a jury trial, jeopardy attaches when a jury is empaneled and sworn." Serfass v. United States, 420 U. S. 377, 388, 95 S. Ct. 1055, 1062, 43 L.Ed.2d 265 (1975). *See also* Illinois v. Somerville, 410 U. S. 458, 467, 93 S. Ct. 1066, 1072, 35 L.Ed.2d 425 (1973); United States v. Jorn, 400 U. S. 470, 474-478, 91 S. Ct. 547, 552-553, 27 L.Ed.2d 543, 550-552 (1971); United States v. Sisson, 399 U. S. 267, 303-305, 90 S. Ct. 2117, 2137-2138, 26 L.Ed.2d 608, 631-632 (1970); Blondes v. State, *supra,* 273 Md. at 444.

With respect to a non-jury trial, most cases had held that jeopardy attaches when the judge begins to hear evidence, although there was a minority view that jeopardy attaches when the first witness is sworn. *See* the discussion in Blondes v. State, *supra,* 273 Md. at 444-446, and the cases therein cited. The Supreme Court has now endorsed the majority view, stating: "In a nonjury trial, jeopardy attaches when the court begins to hear evidence." Serfass v. United States, *supra,* 420 U. S. at 388.

attached begins, rather than ends, the inquiry as to whether the Double Jeopardy Clause bars retrial. That, indeed, was precisely the rationale of [*United States v.*] *Perez* [9 Wheat. 579, 6 L.Ed. 165 (1824)] and subsequent cases. Only if jeopardy has attached is a court called upon to determine whether the declaration of a mistrial was required by 'manifest necessity' or the 'ends of public justice.' "

Thus, where jeopardy has attached to a criminal defendant and a mistrial is thereafter declared, the determination of whether the Fifth Amendment's prohibition against double jeopardy bars a retrial depends upon the reasons for and circumstances surrounding the mistrial declaration.

One circumstance where a retrial is normally permitted after a mistrial, without further examination into the reasons for the mistrial, is where the defendant sought or consented to the mistrial. *United States v. Jorn, supra,* 400 U. S. at 484-485; *Cornish v. State, supra,* 272 Md. at 318-319; *United States v. Beasley,* 479 F. 2d 1124 (5th Cir.), *cert. denied,* 414 U. S. 924, 94 S. Ct. 252, 38 L.Ed.2d 158, *reh. denied,* 414 U. S. 1052, 94 S. Ct. 557, 38 L.Ed.2d 340 (1973); *United States v. Goldstein,* 479 F. 2d 1061, 1066 (2d Cir.), *cert. denied,* 414 U. S. 873, 94 S. Ct. 151, 38 L.Ed.2d 113 (1973). Although not the ground for the Court of Special Appeals' decision, in argument before us the question of whether Jourdan consented to the mistrial on May 21, 1971, appeared to be the principal issue.

Our review of the proceedings convinces us that Judge Taylor's finding, that Jourdan did not consent to the mistrial, is firmly supported by the record. There is some indication that Jourdan's attorney consented to a mistrial during the bench conference on May 21, 1971. When the court stated that it understood that "there is no opposition to the court declaring a mistrial under the circumstances," the defense attorney responded, "Under the circumstances." The Assistant State's Attorney then stated, "So far as the defendant is concerned there is no problem declaring a

mistrial, is that correct?" The defense attorney replied, "That is correct." However, it should be remembered that these comments by the defense attorney were made after the defense attorney had refused to take a position or even comment on declaring a mistrial, were made after the court stated for the record that there was no indication that the defendant "voluntarily consents," and were made after the determination that "the court is going to declare a mistrial."

Assuming arguendo that Jourdan's attorney consented to the mistrial, the evidence clearly shows that Jourdan himself did not consent and, in fact, opposed the mistrial. Jourdan's pretrial activities seeking a speedy trial, and his opposition to continuances sought by the State at the beginning of the May 21, 1971, trial, reveal that he wanted a final resolution of the charges against him as quickly as possible. The discussion at the bench conference concerning a mistrial, and any indication at that conference that his attorney was consenting to a mistrial, were out of Jourdan's hearing. The effort by the Assistant State's Attorney to determine whether Jourdan consented to the mistrial was frustrated by the trial judge who indicated that Jourdan's consent was not needed as the court itself "has disposed [of] it as [a] mistrial." At the post conviction hearing, the Assistant State's Attorney representing the State on May 21, 1971, the attorney representing Jourdan on that date, and Jourdan himself, all testified that Jourdan did not consent to a mistrial. The defense attorney further testified that after the mistrial was declared and the bench conference was over, Jourdan "wanted to know why we weren't going to trial." Jourdan stated that he "made numerous objections to my lawyer" concerning the failure to complete the trial on May 21, 1971. All of this evidence demonstrates that Judge Taylor was fully warranted in finding that Jourdan did not consent to a mistrial. Under other circumstances, where a defendant's attorney consents to a mistrial, the defendant himself might be deemed to have consented or to be bound by his attorney's action. But under the circumstances of this case, the declaration of the

mistrial must be regarded as an unconsented to *sua sponte* declaration by the court. ˙

Recently in *Cornish v. State, supra,* 272 Md. at 316-320, this Court reviewed the standards to be applied in determining whether the double jeopardy clause would prohibit a retrial of a criminal defendant following an unconsented to declaration of a mistrial, reviewed the numerous Supreme Court cases on the subject, and reviewed some of the situations where retrials have been permitted and some of the situations where they have not. We pointed out that since the opinion of Mr. Justice Story in *United States v. Perez,* 9 Wheat. 579, 580, 6 L. Ed. 165 (1824), it has been settled that the constitutional prohibition against double jeopardy permitted a retrial following a mistrial only if there was "manifest necessity" for the mistrial, and that the discretionary power of a court to declare a mistrial "ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes." We also pointed out in *Cornish,* quoting from *United States v. Jorn, supra,* 400 U. S. at 480, that while the Supreme Court has not prescribed strict " 'categories of circumstances which will permit or preclude retrial,' " nevertheless the cases do set forth principles for determining whether mistrials should be declared in various types of circumstances.

Turning to the instant case, there was no "manifest necessity" for the *sua sponte* declaration of a mistrial. As Judge Taylor found, the Assistant State's Attorney who took over after the Deputy State's Attorney became ill could have handled the prosecution of the cases against Jourdan. The uncontroverted testimony was that the Deputy State's Attorney had taken only ten or fifteen minutes to prepare for trial after having been assigned the cases shortly before the trial was scheduled to begin, and that the Assistant State's Attorney was experienced in cases of this nature. There is nothing in the subject record to indicate that the Assistant State's Attorney, after a brief recess, could not have been as prepared as was the Deputy State's Attorney. Long ago it was stated in *United States v. Watson,* 3 Ben. 1,

28 Fed. Cas. 499, 500-501, Fed. Case No. 16,651 (S.D. N.Y. 1868):

> "The illness of the district attorney, it not appearing by the minutes . . . that it was impossible for the assistant district attorney to conduct the trial, . . . cannot be regarded as creating a manifest necessity for withdrawing a juror. . . . The mere illness of the district attorney . . . is no ground upon which, in the exercise of a sound discretion, a court can, on the trial of an indictment, properly discharge a jury, without the consent of the defendant, after the jury has been sworn and the trial has thus commenced."

Moreover, even if the Assistant State's Attorney could not have taken over the prosecution on May 21, 1971, we would not under the circumstances here conclude that a mistrial was necessary. This Court in *Cornish v. State, supra,* 272 Md. at 320, pointed out that "a retrial is barred by the Fifth Amendment where reasonable alternatives to a mistrial, such as a continuance, are feasible and could cure the problem." *See also United States v. Jorn, supra,* 400 U. S. at 487; *Thomas v. Beasley,* 491 F. 2d 507, 509-510 (6th Cir.), *cert. denied,* 417 U. S. 955, 94 S. Ct. 3083, 41 L.Ed.2d 674 (1974); *United States v. Kin Ping Cheung,* 485 F. 2d 689, 691 (5th Cir. 1973); *United States v. Tinney,* 473 F. 2d 1085, 1089 (3d Cir.), *cert. denied,* 412 U. S. 928, 93 S. Ct. 2752, 37 L.Ed.2d 156 (1973). In the present case, no reason has been suggested why the alternate remedy of a continuance was not feasible. If it would have taken the Assistant State's Attorney until the next morning to get ready for the trial, a continuance until that time could have been granted. Or, if there were some reason (not apparent on this record) why the Assistant State's Attorney could not handle the prosecution the next day or shortly thereafter, the case could have been continued for a reasonable time until the Deputy State's Attorney was able to resume his duties. As the six month jury term of this jury was far from over, the jury

could have been called back as soon as the Deputy State's Attorney was ready to resume his duties.

Judge Taylor, at the conclusion of the post conviction hearing, correctly concluded that there was no "manifest necessity" for the *sua sponte* declaration of a mistrial on May 21, 1973, and that, therefore, Jourdan's retrial violated the constitutional prohibition against double jeopardy.

> *Judgment of the Court of Special Appeals reversed.*
>
> *Costs to be paid by Prince George's County.*

*Smith, J., dissenting:*

I would affirm the decision of the Court of Special Appeals and reverse the order entered by the Circuit Court for Prince George's County. My reasons were cogently set forth by Chief Judge Orth for the Court of Special Appeals in *State v. Jourdan,* 22 Md. App. 648, 325 A. 2d 164 (1974), which opinion I adopt. I would add only a few additional words.

As stated by the Court of Special Appeals and the majority opinion here, the standard in this regard since the opinion of Mr. Justice Story in *United States v. Perez,* 22 U. S. (9 Wheat.) 579, 6 L. Ed. 165 (1824), has been whether the trial court "exercise[d] a sound discretion on the subject . . . ." It is easy in any given situation, particularly in the isolation of the chambers of an appellate judge, to say that a certain course of action should or should not have been taken. I note that in a recent game involving the Baltimore Orioles a sportswriter questioned the wisdom of the manager in removing his starting pitcher in the ninth inning and his various moves thereafter, Baltimore having been ahead at the time of the removal and having ultimately lost the game by one run in the twelfth inning. The manager, however, was on the spot where he was obliged to make his determinations quickly upon the basis of his best judgment at the time. So was the trial judge in this instance. It is to be noted in this regard that the trial judge was no neophyte. He

is a distinguished, conscientious, able judge with six years of service prior to this trial, one who is willing to work.

It is all very well now for us to say that it only took the prosecutor 15 or 20 minutes to review the file and be ready for trial and that thus the trial could have continued on that Friday afternoon. There is nothing in the record to show that the trial judge was aware of the fact that the State thought it could be ready in such a brief period of time.[1] Moreover, I have seen entirely too many cases in my short time on the Court of Appeals where I thought prosecutors had done just that, taking 15 or 20 minutes to prepare their cases when the interest of the public would have been better served by more adequate preparation.

No doubt the fact that the normal tour of duty for the jury panel was intended to expire that day, with the thought that some of the good citizens serving on the jury might have made good faith commitments for the following week based upon the normal expiration of their time for jury service, went through the judge's mind and entered into his decision. Moreover, he did direct that an assistant state's attorney and defense counsel "proceed to the State's Attorney's Office and set [the case] at the earliest practical date," adding, "Go back and list your calendars, and reschedule this case as soon as possible. If you gentlemen cannot resolve it within sensibility I will be back in my office very shortly. I will be available."

Paraphrasing slightly the opinion of the Court of Special Appeals in its quotation from *Baker, Whitfield & Wilson v. State*, 15 Md. App. 73, 89, 289 A. 2d 348 (1972), *cert. denied*, 266 Md. 733, 744, 411 U. S. 951 (1973), I do not believe here "there was an abuse of the trial process resulting in prejudice to the accused, by way of harassment or the like, such as to outweigh society's interest in the punishment of crime."

---

1. I daresay if defense counsel were shown to have spent only 15 or 20 minutes in preparing a case such as this there would be a strong contention that this amounted to inadequate representation.